862 F.2d 1228
 24 Soc.Sec.Rep.Ser. 63, Medicare&Medicaid Gu 37,532
STATE OF OHIO DEPARTMENT OF HUMAN SERVICES, Petitioner,
Dorothy Willoweit, Benjamin Lehman, Roberta Lehman,
Individually and on Behalf of All Others Similarly
Situated, Intervenors-Petitioners,
v.
UNITED STATES DEPARTMENT OF HEALTH & HUMAN SERVICES, HEALTH
CARE FINANCING ADMINISTRATION, Respondent.
 No. 86-3449.
 United States Court of Appeals,
Sixth Circuit.
 Argued April 16, 1987.
Decided Nov. 28, 1988.
 
 Anthony J. Celebrezze, Jr., Atty. Gen., Sheila P. Cooley, Asst. Atty. Gen., State Departments Section, Columbus, Ohio, Alan Schwepe, argued, for petitioner.
 David R. Smith, argued, Washington, D.C., Office of the Gen. Counsel, Health Care Financing Div., Dept. of Health & Human Services, Washington, D.C., for respondent.
 Gregory S. French, Cincinnati, Ohio, Janet Pecquet, for intervenors-petitioners.
 Before MERRITT and NELSON, Circuit Judges, and CONTIE, Senior Circuit Judge.
 DAVID A. NELSON, Circuit Judge.
 
 
 1
 Dissatisfied with a final determination in which the United States Department of Health and Human Services disapproved Ohio Medicaid State Plan Amendment No. 84-2, the State of Ohio has petitioned for review of that determination under 42 U.S.C. Sec. 1316.
 
 
 2
 The Plan Amendment would liberalize Ohio's formula for determining how much money should be allocated from Medicaid funds, in effect, for maintenance and support of non-institutionalized spouses of institutionalized Medicaid recipients. Health and Human Services disapproved Ohio's proposal on the basis of a "maintenance amount ceiling," as we shall call it, contained in a 1978 amendment to a regulation first adopted by the United States Department of Health, Education and Welfare in 1974. The 1978 amendment was promulgated as a final rule without the prior notice and opportunity for comment required by the Administrative Procedure Act for rules that are not "interpretative" in character. 5 U.S.C. Sec. 553(b)(A).
 
 
 3
 HHS maintains that the 1978 amendment to the agency's regulation was interpretive, rather than substantive; the contention is that the rule merely made explicit a limitation or ceiling that had been implicit in the original regulation from the beginning. In support of this contention HHS points to a 1976 manual that set forth a ceiling comparable to the one written into the actual regulation two years later.
 
 
 4
 The State of Ohio, on the other hand, insists that the 1978 amendment was substantive rather than interpretive. The state points out that in 1974, acting under the original regulation, the agency itself approved an Ohio plan that ignored the ceiling now claimed to have been part of the regulation from the beginning. If the ceiling was invisible to the agency's own people when the 1974 regulation was still new, the state suggests, the state does not have to observe the ceiling unless and until a rule imposing it is adopted in a rulemaking proceeding conducted in conformity with the notice and comment requirements of the Administrative Procedure Act.
 
 
 5
 For the reasons set forth below, we conclude that the state is correct; the ceiling rule adopted in 1978 was not an "interpretative" rule exempt from the notice and comment requirements. Because the decision disapproving the Ohio Plan Amendment was based on a rule that had not been validly adopted, the decision is not in accordance with law and must be reversed.
 
 
 6
 * The federal Medicaid program, Title XIX of the Social Security Act, 42 U.S.C. Secs. 1396 et seq., was enacted in 1965 "for the purpose of providing federal financial assistance to States that choose to reimburse certain costs of medical treatment for needy persons." Harris v. McRae, 448 U.S. 297, 301, 100 S.Ct. 2671, 2680, 65 L.Ed.2d 784 (1980). Section 1902(a)(10) of the Act, 42 U.S.C. Sec. 1396a(a), set forth the basic requirements for the program. Under the Act, participating states were required to provide Medicaid coverage to individuals described as the "categorically needy," i.e., those who were entitled to receive financial assistance as members of one of four categories of disadvantaged people designated in the Act. Schweiker v. Hogan, 457 U.S. 569, 572, 102 S.Ct. 2597, 2600, 73 L.Ed.2d 227 (1982); Turner v. Heckler, 783 F.2d 657, 658 (6th Cir.1986). In addition, states had the option of providing coverage for the "medically needy" (persons included under the state's Medicaid plan pursuant to 42 U.S.C. Sec. 1396a(a)(10)(C)). Schweiker v. Gray Panthers, 453 U.S. 34, 37, 101 S.Ct. 2633, 2637, 69 L.Ed.2d 460 (1981).
 
 
 7
 In 1972 Congress consolidated three of the four categorical assistance programs into one Supplemental Security Income (SSI) program for the Aged, Blind and Disabled. 42 U.S.C. Secs. 1381 et seq.; Turner, 783 F.2d at 658. Although the SSI program is funded by the federal government alone, adoption of the program caused some states to experience an increase in their Medicaid obligations. Schweiker v. Hogan, 457 U.S. at 581-82, n. 18, 102 S.Ct. at 2605-06, n. 18. To avoid imposing a "substantial fiscal burden" on such states or discouraging them from participating, Congress offered what became known as the "Sec. 209(b) option," codified at 42 U.S.C. Sec. 1396a(f). Under that option, which became effective in January of 1974, states could elect to provide Medicaid assistance only to those individuals who would have been eligible under the state plan in effect on January 1, 1972. See Schweiker v. Gray Panthers, 453 U.S. at 38-39, 101 S.Ct. at 2637-38. Ohio is one of the states that have elected to exercise the Sec. 209(b) option.
 
 
 8
 Under the Medicaid system, individual states prepare state plans that are evaluated by HHS under regulations now codified at 42 C.F.R. Part 435. In 1974, following a notice and comment proceeding, the Department of Health, Education and Welfare, a predecessor of HHS, adopted as part of these regulations a rule governing the amount of an institutionalized Medicaid recipient's income that would have to be contributed to the cost of his care at the institution. Where the Medicaid recipient had a spouse who continued to live at home, the regulation said, provision would have to be made for the appropriate level of income to be applied first to the maintenance of the spouse, before any residue went to defray institutionalization costs:
 
 
 9
 "(b) With respect to both the categorically needy and, if they are included in the plan, the medically needy, a State plan must:
 
 
 10
 (1) Provide that only such income and resources as are actually available [for payment to the institution] will be considered and that income and resources will be reasonably evaluated.
 
 
 11
 * * *
 
 
 12
 * * *
 
 
 13
 (4) * * * When ... an [institutionalized] individual's home is maintained for a spouse or other dependents, the appropriate income level for such dependents, plus the individual's income level for maintenance in a long-term care facility, shall be applied. A higher level of maintenance may also be applied for a temporary period, not to exceed six months, to allow an individual to apply his income and resources to maintenance of a home if a physician has certified that such individual is likely to return to the home within such temporary period."
 
 
 14
 39 Fed.Reg. 9512, 9516 (March 11, 1974) (codified initially at 45 C.F.R. Sec. 248.3(b)).
 
 
 15
 In response to this new regulation, Ohio submitted a state plan that included a "family budgeting system." Ohio explains the operation of this system as follows:
 
 
 16
 "Under the family budgeting system, the income of the institutionalized Medicaid recipient was combined with the income of the community [i.e., non-institutionalized] spouse. The Medicaid need (or categorically needy) standard was deducted from the total family income. The remaining income was then prorated between all family members, including the institutionalized Medicaid recipient. The recipient's prorated share, less $25 for his or her personal expenses, was paid toward the cost of institutional care. The remaining family members retained their prorated shares, plus the [categorically needy standard amount], which was to be applied to their living expenses."
 
 
 17
 Ohio's plan was duly approved, in 1974, by the cognizant Regional Office of the Department of Health, Education and Welfare. The plan ought not to have been approved if the phrase "the appropriate income level," as used in 45 C.F.R. Sec. 248.3(b), meant something other than the amount of income determined by the state to be appropriate for dependents of the Medicaid recipient upon the latter's being placed in an institution. The Ohio plan made it possible for a spouse who remained at home to receive more than the general "need standard" for the spouse of an aged, blind or disabled person--and the agency now claims that this was improper. A "Medical Assistance Manual" issued by HEW in 1976--issued, it should be noted, without a rulemaking proceeding under the Administrative Procedure Act--said that the amount designated for the maintenance needs of the institutionalized Medicaid recipient's at-home spouse "may not exceed the need standard recognized by ... a State supplementary payment program (for the spouse of an aged, blind, or disabled person)...." HHS asserts that the manual represented "a correct statement of the Department's view of the [1974] regulation." The Department acknowledges that its approval of Ohio's family budgeting system in 1974 was at odds with the view the agency now takes of the 1974 regulation, but we are asked to attach no significance to this "erroneous" approval because of "the confusion inherent in implementing the SSI program" after enactment of the 1972 amendments.
 
 
 18
 Ohio continued to follow its family budgeting system for several years, but in 1978 HEW published a Federal Register notice announcing, without any prior notice or opportunity to comment, adoption of a "final rule" containing a maintenance amount ceiling inconsistent with Ohio's family budgeting system. 43 Fed.Reg. 9810, 9814 (March 10, 1978). As codified initially at 42 C.F.R. Sec. 448.3(b)(7)(ii), the rule said that when the home of an institutionalized Medicaid recipient was maintained for a spouse or other dependents,
 
 
 19
 "an additional amount [of money], established by the State, must be protected for the maintenance needs of any eligible institutionalized individual's spouse or dependents living outside the facility. Such additional amounts must be based on a reasonable assessment of need and may not exceed the maintenance amount recognized by the State for categorically or medically needy persons living in the community." (Emphasis supplied.)
 
 
 20
 Notwithstanding the statutory requirement that rules adopted in final form be accompanied by "a concise general statement of their basis and purpose," 5 U.S.C. Sec. 553(c), one searches the Federal Register notice in vain for any intelligible statement of the basis and purpose of the maintenance amount ceiling contained in Sec. 448.3(b)(7)(ii). The preamble to the revisions says that "[t]hese amendments ... are required by statutory changes enacted in 1976," but adds that
 
 
 21
 "[a]dditional changes clarify existing rules about which questions have been asked. Those changes are described below, under Supplementary Information."
 
 
 22
 A section of the preamble captioned "Supplementary Information" goes on to describe a number of changes, but the one with which we are concerned is not among them. If the preamble says anything at all about the maintenance amount ceiling, therefore, it is that adoption of the ceiling was "required by statutory changes enacted in 1976"--and that simply is not so. If the draftsmen of the notice intended to say that the ceiling was being adopted to "clarify" an existing rule about which questions had been asked, they failed to say what they meant.
 
 
 23
 Even the portion of the Federal Register notice purporting actually to adopt the ceiling is flawed. At the end of the "Supplementary Information" section the notice states "[a]ccordingly, 42 C.F.R. Part 448 is amended as follows: * * * (3) In Sec. 448.3, paragraphs (b)(1)(ii), (8) and (9) are revised. The changes are set forth below." One of the changes "set forth below" is a version of paragraph (b)(7) that contains the maintenance amount ceiling--but paragraph (b)(7) is not among the paragraphs which the enacting provision lists as being revised.
 
 
 24
 This last defect, at least, was cured by a Federal Register notice published in September of 1978 at 43 Fed.Reg. 45176 (September 29, 1978). The September notice effected a "reorganization and rewriting" of the Medicaid regulations. The contents of former section 448.3(b)(7) were parceled out among several new sections, one of which (Sec. 435.733(b)) contained the following rule for determining the "countable income" of institutionalized individuals:
 
 
 25
 "If the individual has only a spouse at home, the agency must deduct from the individual's income an amount for the spouse's maintenance needs. This amount must be based on a reasonable assessment of need but must not exceed the higher of--
 
 
 26
 (i) The more restrictive income standard established under Sec. 435.121 [dealing with categorically needy individuals] or
 
 
 27
 (ii) The medically needy standard for an individual."
 
 
 28
 Various "technical and wording errors" in the rewritten Medicaid regulations were subsequently corrected by a notice published at 45 Fed.Reg. 24878 (April 11, 1980). That notice placed the maintenance amount ceiling in 42 C.F.R. Sec. 435.733(c)(2), where it has remained to the present time. Section 435.733(c)(2) reads as follows:
 
 
 29
 "(c) The agency must deduct the following amounts, in the following order, from the individual's total income including amounts disregarded in determining eligibility:
 
 
 30
 * * *
 
 
 31
 * * *
 
 
 32
 (2) For an individual with only a spouse at home, an additional amount for the maintenance needs of the spouse. This amount must be based on a reasonable assessment of need but must not exceed the higher of--
 
 
 33
 (i) The more restrictive income standard established under Sec. 435.121; or
 
 
 34
 (ii) The medically needy standard for an individual."
 
 
 35
 Ohio responded to the new regulation and to suggestions from HHS by submitting a plan designed to conform to the maintenance amount ceiling. This led to the filing of a class action against the state on behalf of elderly couples who would be affected by the change. See Turner v. Heckler, 573 F.Supp. 867 (S.D. Ohio 1983), rev'd, 783 F.2d 657 (6th Cir.1986). The district court granted the plaintiffs a preliminary injunction and eventually oversaw a settlement that obligated Ohio to adopt the more liberal plan it now supports. Notwithstanding the reversal of the preliminary injunction on appeal, Ohio continues to support the plan.
 
 
 36
 When the latest plan was submitted to HHS for approval, the agency rejected it as not in compliance with 42 C.F.R. Sec. 435.733(c)(2). Ohio requested a reconsideration hearing, and the matter was assigned to a hearing officer for formulation of a recommended decision. The named plaintiffs in the class action were allowed to intervene. After consideration of the record and briefs, the hearing officer made the following findings, among others:
 
 
 37
 "2. The revision to 42 CFR 448.3(b)(7) in 1978 was a change attempting to clarify the interpretative position of the Agency.
 
 
 38
 3. The Agency ... made no significant substantive changes in its publication of 42 CFR 448.3(b)(7) in March 1978.
 
 
 39
 4. The provisions of the Administrative Procedure Act regarding publication and notice of rule making were not violated by the Agency."
 
 
 40
 Believing that the agency's adoption of the maintenance amount ceiling was not invalid under the Administrative Procedure Act, and concluding that the state's amended plan would violate the ceiling, the hearing officer recommended that the disapproval of the plan amendment be affirmed. That recommendation was adopted in the final agency decision that is now before us for review.
 
 
 41
 The first question presented to us--and the only one we need decide, in view of our disposition of the case--is whether the agency erred as a matter of law in concluding that the maintenance amount ceiling was validly adopted as an interpretive rule for which advance notice and opportunity for comment were not required. As indicated at the outset of this opinion, we think that the agency's conclusion on this point was erroneous as a matter of law.
 
 II
 
 42
 The distinction between substantive (or "legislative") and interpretive rules is a "deeply established" one. American Trucking Ass'n. v. United States, 688 F.2d 1337, 1341 n. 4 (11th Cir.1982) (quoting K. Davis, Administrative Law of the Seventies, Sec. 5.03 at 149-50). A legislative rule is one that "has the force of law," while an interpretive rule is "merely a clarification or explanation of an existing statute or rule" and is " 'issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers.' " Guardian Fed. Sav. & Loan v. Fed. Sav. & Loan Ins. Corp., 589 F.2d 658, 664-65 (D.C.Cir.1978) (quoting U.S. Department of Justice, Attorney General's Manual on the Administrative Procedure Act 30 n. 3 (1947)). Legislative rules "grant rights, impose obligations, or produce other significant effects on private interests," while interpretive rules do not "foreclose alternative courses of action or conclusively affect rights of private parties." Batterton v. Marshall, 648 F.2d 694, 701-02 (D.C.Cir.1980) (footnote omitted).
 
 
 43
 Unlike "interpretative" rules (the form of the adjective used in 5 U.S.C. Sec. 553(b)), legislative rules may not be adopted without prior publication in the Federal Register of a "notice of proposed rule making."[1] The notice of proposed rulemaking must include
 
 
 44
 "(1) a statement of the time, place, and nature of public rule making proceedings;
 
 
 45
 (2) reference to the legal authority under which the rule is proposed; and
 
 
 46
 (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved."
 
 
 47
 5 U.S.C. Sec. 553(a). The purpose of the these provisions is to give those affected by the change an opportunity to participate in the rulemaking process. See National Ass'n of Home Health Agencies v. Schweiker, 690 F.2d 932 (D.C.Cir.1982), cert. denied, 459 U.S. 1205, 103 S.Ct. 1193, 75 L.Ed.2d 438 (1983); see also Chrysler Corp. v. Brown, 441 U.S. 281, 302-03, 315, 99 S.Ct. 1705, 1718-19, 1724, 60 L.Ed.2d 208 (1979) (legislative rules have force of law only when promulgated according to statutory notice and comment procedures; notice and comment not required for interpretive rules).
 
 
 48
 One factor that courts have considered in distinguishing between legislative and interpretive rules is the impact that a given rule has on those to whom the rule applies. The 1960s and 1970s saw the development of a significant body of law suggesting, indeed, that notice and comment proceedings must take place even for an interpretive rule if the rule will have a substantial impact. See K. Davis, Administrative Law Treatise Sec. 7.17 (1978). A leading "substantial impact" case decided during this period was National Motor Freight Traffic Ass'n v. United States, 268 F.Supp. 90 (D.D.C.1967) (Burger, McGowan and Sirica, JJ.), aff'd, 393 U.S. 18, 89 S.Ct. 49, 21 L.Ed.2d 19 (1968). See also Brown Express, Inc. v. United States, 607 F.2d 695, 701-02 (5th Cir.1979) (applying "substantial impact" rule); Reynolds Metals Co. v. Rumsfeld, 564 F.2d 663, 669 (4th Cir.1977) (same), cert. denied, 435 U.S. 995, 98 S.Ct. 1646, 56 L.Ed.2d 84 (1978). But see Citizens to Save Spencer County v. United States Envtl. Protection Agency, 600 F.2d 844, 876 n. 153 (D.C.Cir.1979) (finding of substantial impact not determinative of whether rule is interpretive or legislative).
 
 
 49
 Whatever the merits of the substantial impact approach, the Court of Appeals for the District of Columbia Circuit has observed, in a passage with which we fully agree, that
 
 
 50
 "the distinction between legislative and nonlegislative rules has been described as 'enshrouded in considerable smog.' ... Nonetheless, there are certain general principles that aid reviewing courts in making the determination whether a given rule is legislative or interpretative. First, the agency's own label, while relevant, is not dispositive.... An interpretative rule simply states what the administrative agency thinks the statute means, and only " 'reminds" affected parties of existing duties.' ... On the other hand, if by its action the agency intends to create new law, rights or duties, the rule is properly considered to be a legislative rule."
 
 
 51
 General Motors Corp. v. Ruckelshaus, 742 F.2d 1561, 1565 (D.C.Cir.1984) (en banc ), cert. denied, 471 U.S. 1074, 105 S.Ct. 2153, 85 L.Ed.2d 509 (1985) (citations omitted).
 
 
 52
 The 1978 rule with which we are concerned in the case at bar did not "remind" states of a pre-existing regulatory limitation on the amount to be applied for maintenance of a non-institutionalized spouse. The rule imposed a ceiling ex proprio vigore. The rule was mandatory, not advisory, and the mandate was a new one.
 
 
 53
 The original regulation, as adopted in 1974, seemed on its face to leave it up to states to decide what "the appropriate income level" ought to be for such dependents. Nothing in the original notice of proposed rulemaking, 38 Fed.Reg. 32216 (November 21, 1973), or in the preamble to the 1974 regulation, 32 Fed.Reg. 9512 (March 11, 1974), suggested the existence of any statutory or regulatory ceiling on the income level that was to be selected by the state as "appropriate." The original notice complained, indeed--doubtless with considerable justification--that "the Department has had little legislative guidance...." 38 Fed.Reg. 32216. If there had been a statutory ceiling on the "appropriate" maintenance amount, the agency presumably could not have provided, as it did provide in 1974, that a higher level of maintenance might be allowed for up to six months for real estate maintenance purposes. See 39 Fed.Reg. 9516. And if there had been an administrative ceiling of the sort now claimed to have been implicit in the regulations, the agency presumably would not have approved--as it did approve, in the same year in which the regulation was adopted--an Ohio plan admittedly inconsistent with any such ceiling.
 
 
 54
 The agency urges us to accord "considerable deference" to the interpretation reflected in the Medical Assistance Manual published in 1976. In light of the contemporaneous interpretation reflected in the agency's approval of Ohio's original plan in 1974, however, we decline to do so. See Standard Oil Co. v. Department of Energy, 596 F.2d 1029 (Em.App.1978), which presents an interesting parallel to the situation confronting us here. There too an agency had adopted regulations in 1974 with very little legislative guidance. There too, during a period of "confusion and uncertainty," certain "lower level officials" had given the regulations a practical construction inconsistent with an interpretation first publicly announced by the agency in 1976. Id. at 1052, 1056. There too the courts were invited to defer to the 1976 interpretation notwithstanding the inconsistency. Two United States district courts and the Temporary Emergency Court of Appeals declined the invitation. See Phillips Petroleum Co. v. Dept. of Energy, 449 F.Supp. 760, 784 (D.Del.1978), where Chief Judge Latchum observed that "contemporaneous expressions of opinion by low-ranking officials [are considered] highly relevant and material evidence of the general understanding of ambiguous regulatory provisions," and Standard Oil Co. v. Federal Energy Admin., 453 F.Supp. 203 (N.D. Ohio 1978), where Judge Manos likewise discounted the 1976 interpretation because it was in conflict with what the agency had done earlier.
 
 
 55
 In affirming both district court decisions, the Emergency Court of Appeals expressed itself as follows:
 
 
 56
 "Deference to an agency's 'interpretation' ... is not a hard and fast rule. The weight to be given to an administrative interpretation depends upon 'the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all of those factors which give it power to persuade, if lacking power to control'. Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124, 129 (1944).
 
 
 57
 * * *
 
 
 58
 * * *
 
 
 59
 "We do not, of course, question the rule of deference set forth in Udall v. Tallman [380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616] and related cases. This rule is simply not applicable to the FEA's interpretation first announced on February 1, 1976, at the end of the relevant period. The FEA relies upon an after the fact interpretation.... Yet, it is undisputed that during the relevant period the only public pronouncements were made by officials of the Office of Compliance and the FEA auditors and were contrary to the interpretation set forth in the February 1, 1976 rule.
 
 
 60
 "The FEA contends that only the FEA's General Counsel, his staff, and other 'high level policy makers' had the authority to issue official interpretations of its regulations. Consequently, it argues, in determining what the agency's interpretation was this court should ignore the actions of the FEA auditors and other lower level officials during the relevant period. This court held in California Molasses Co. v. California & Hawaiian Sugar Co., 551 F.2d 1230, 1235, 1239 (Em.App.1977), that the interpretation of agents of the IRS, which had been charged with enforcing price controls, were entitled to deference by the courts. We recognize, as the FEA argues, that California Molasses is not precisely in point. We do conclude, however, that the statements by the FEA auditors and other lower level officials are entitled to weight in determining the thoroughness of the FEA's consideration of its regulations, the validity of its reasoning, and its consistency with earlier and later prouncements. In any event, we find no basis for according deference to the interpretation of the FEA first announced on February 1, 1976."
 
 
 61
 Standard Oil, 596 F.2d at 1056.
 
 
 62
 The "thoroughness" evident in HEW's consideration of the maintenance amount ceiling is most unimpressive, as our discussion of the notice published at 43 Fed.Reg. 9810 has already indicated. The ceiling was consistent with the 1976 interpretation of the 1974 regulation, but not with the interpretation the Regional Office gave the 1974 regulation in the year of its adoption. The ceiling was in no way compelled by the original regulation, as we read it, or by the underlying statute, 42 U.S.C. Sec. 1396a(a)(17). For the agency to have imposed the ceiling without giving the states and interested Medicaid recipients an opportunity to participate in the rulemaking was out of step with both the letter and spirit of the Administrative Procedure Act. Cf. Saunders, Interpretative Rules with Legislative Effect: An Analysis and a Proposal for Public Participation, 1986 Duke L.J. 346, 383.
 
 
 63
 The agency invites our attention to the 1974 regulation's use of the definite article in the phrase "the appropriate income level," and argues that "the" appropriate level had to be "the" level established for some other purpose, rather than "a" level established by the state specifically for dependents of institutionalized Medicaid recipients. The very amendments on which the agency relied in disapproving Ohio Plan Amendment No. 84-2, however, make it clear that Ohio was required to make "a reasonable assessment of need" specifically for dependents of institutionalized Medicaid recipients. We are at a loss to understand why "the appropriate income level" to be applied for such dependents under the 1974 regulation would not have been a level specifically established by the state for that purpose.
 
 
 64
 The administrator who disapproved Ohio Plan Amendment No. 84-2, as we are told in the hearing officer's recommended decision, was concerned over the fact that the Plan Amendment would effectively set the maintenance needs of the non-institutionalized spouse at $582 per month. The hearing officer commented that "[t]his high maintenance needs allowance for a non-institutionalized spouse (who may not even be Medicaid eligible) places this individual in a better position at the expense of the Medicaid program than actual Medicaid recipients"--and the anomaly is greatest, we presume, where the state has exercised its Sec. 209(b) option, as Ohio has done. The mere fact that a lower ceiling on the maintenance allowance might have been appropriate or desirable, however, does not mean that the 1974 regulation imposed one. Like the Regional Office which approved Ohio's plan initially under the 1974 regulation, we simply cannot discern any such ceiling in the regulation as originally written.
 
 
 65
 If, as we have concluded, the ceiling was not implicit in the regulation from the beginning, it could not be imposed later on without compliance with the notice and comment requirements of the Administrative Procedure Act. In the decision here under review, the agency maintains that there was compliance with the Act because public comment was invited after-the-fact. That, in our view, is not good enough.
 
 
 66
 Were we to accept the argument that a mere expression of a willingness to receive post-promulgation comments is enough to excuse an agency's failure to seek and consider comments before promulgation, it "would lead in the long run to depriving parties affected by agency action of any way to enforce their Sec. 553 rights to pre-promulgation notice and comment." United States Steel Corp. v. United States Envtl. Protection Agency, 595 F.2d 207, 214 (5th Cir.1979). As the court, speaking through Judge Godbold, went on to say in U.S. Steel, the argument
 
 
 67
 "overlooks ... the crucial difference between comments before and after rule promulgation. Section 553 is designed to ensure that affected parties have an opportunity to participate in and influence agency decision making at an early stage, when the agency is more likely to give real consideration to alternative ideas. Other courts have recognized this difference and rejected arguments similar to that asserted here:
 
 
 68
 Permitting the submission of views after the effective date is no substitute for the right of interested persons to make their views known to the agency in time to influence the rule making process in a meaningful way.... 'We doubt that persons would bother to submit their views or that the Secretary would seriously consider their suggestions after the regulations are a fait accompli.'
 
 
 69
 City of New York v. Diamond, 379 F.Supp. 503, 517 (S.D.N.Y.1974), quoting Kelly v. Department of Interior, 339 F.Supp. 1095, 1101 (E.D.Cal.1972). Similar conclusions were reached in Maryland v. EPA, 530 F.2d 215, 222 (CA 4, 1975), vacated on other grounds sub nom. EPA v. Brown, 431 U.S. 99, 97 S.Ct. 1635, 52 L.Ed.2d 166 (1977), and Wagner Electric Corp. v. Volpe, 466 F.2d 1013, 1020 (CA3, 1972). The case at hand does not differ from these in any significant way. Were we to allow the EPA to prevail on this point we would make the provisions of Sec. 553 virtually unenforceable. An agency that wished to dispense with pre-promulgation notice and comment could simply do so, invite post-promulgation comment, and republish the regulation before a reviewing court could act."
 
 
 70
 U.S. Steel, 595 F.2d at 214-15.
 
 
 71
 In the case before us, the agency's failure to comply with the rulemaking requirements of the Administrative Procedure Act is fatal to the validity of the maintenance amount ceiling rule. As Judge Manos observed in Standard Oil, 453 F.Supp. at 243,
 
 
 72
 "agency action taken in disregard of statutory rulemaking procedures is void. See e.g. Morton v. Ruiz, 415 U.S. 199, 94 S.Ct. 1055, 37 L.Ed.2d 270 (1974); Consumers Union of United States, Inc. v. Sawhill, 393 F.Supp. 639 (D.D.C.), aff'd per curiam, 523 F.2d 1404 (TECA 1975); Joseph v. United States Civil Service Comm'n, 18 U.S.App.D.C. 281, 294-95, 554 F.2d 1140, 1153-54 (1977); Rodway v. United States Dept. of Agriculture, 168 U.S.App.D.C. 387, 395, 514 F.2d 809, 817 (1975); United States v. Finley Coal Co., 493 F.2d 285, 291 (6th Cir.1974). As the Temporary Emergency Court of Appeals stated in California v. Simon, 504 F.2d 430, 439 (TECA, 1974) 'substantial compliance with rulemaking requirements is essential to the validity of administrative rules.' "
 
 
 73
 See also Pickus v. United States Bd. of Parole, 507 F.2d 1107, 1114 (D.C.Cir.1974) (rules not adopted in accordance with Administrative Procedure Act rulemaking requirements were invalid).
 
 
 74
 The maintenance amount ceiling rule never having been validly adopted, we REMAND this case to HHS for review of Ohio State Medicaid Plan Amendment No. 84-2 under such regulations as were validly adopted.
 
 
 
 [1]
 Although matters relating to "public benefits" are exempt from the rulemaking requirements of the statute under 5 U.S.C. Sec. 553(a)(2), the predecessor agency of HHS elected in 1971 to waive the exemption prospectively. See Humana of South Carolina, Inc. v. Califano, 590 F.2d 1070, 1084 (D.C.Cir.1978) (citing 36 Fed.Reg. 2532 (1971))