**Michael J. FRIEDRICH,
Plaintiff–Appellee,**

**v.**

**SECRETARY OF HEALTH AND HUMAN SERVICES,
Defendant–Appellant.**

No. 89–3236.

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 28, 1989.

Decided Jan. 25, 1990.

Rehearing Denied March 7, 1990.

Thomas M. Carolin, Keith A. Savidge, Gregory D. Seeley, argued, Seeley, Savidge & Aussem, Cleveland, Ohio, for plaintiff-appellee.

Alan S. Dorn, Dept. of Health and Human Services, Office of the Gen. Counsel, Region V, Chicago, Ill., Kathleen Ann Sutula, Asst. U.S. Atty., Cleveland, Ohio, John S. Koppel, argued, Anthony J. Steinmeyer, Dept. of Justice Civ. Div., Appellate Staff, Washington, D.C., for defendant-appellant.

Before MILBURN and GUY, Circuit Judges, and LIVELY, Senior Circuit Judge.

LIVELY, Senior Circuit Judge.

This case concerns a claimant's right to reimbursement under Part B of the Medicare Act, 42 U.S.C. § 1395 *et seq.* (1982), for a medical procedure that the Secretary of Health and Human Services (the Secretary) has found not to be "reasonable and necessary for the diagnosis or treatment" of the claimant's particular illness. 42 U.S.C. § 1395y(a)(1). The appeal presents two questions for decision: (1) Whether a "national coverage determination" by the Secretary is invalid if promulgated without compliance with the notice and comment requirements of the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq.* (1982); and (2) whether a hearing before an officer who is bound by such a determination violates due process.

## I.

### A.

The Medicare Act consists of two parts or programs. Part A provides insurance against the cost of institutional health services. Part B, the portion at issue here, is a voluntary, supplemental medical insurance program that covers 80 percent of the "reasonable charge" for a number of services, including certain physician services, x-rays, lab tests and medical supplies. The purpose of this section is to complement existing insurance coverage for the aged and disabled. Part B is financed through monthly fee charges to the beneficiaries and funding from the government. Thus, Part B may be said to resemble "a private medical insurance program that is subsidized in major part by the Federal Government." *Schweiker v. McClure,* 456 U.S. 188, 190, 102 S.Ct. 1665, 1667, 72 L.Ed.2d 1 (1982).

Because of the substantial dimensions of the program, Part B is managed for the Secretary by "carriers," insurance companies who administer the payment of qualifying claims. The Secretary pays the carriers' costs resulting from claims administration and the carriers, acting as the Secretary's agents, in turn determine whether a claimed item or service is covered by the program. The carriers make this determination in strict accordance with the Medicare statute and the regulations, instructions and guidelines promulgated by the Secretary. 42 C.F.R. part 405, subpart H (1980).

Of particular relevance to this case is the fact that under Part B, the Secretary and the insurance carriers are required to deny reimbursement for services that are not "reasonable and necessary for the diagnosis or treatment" of a claimant's illness or injury. 42 U.S.C. § 1395y(a)(1). A finding of what services are "reasonable and necessary" is often made on a case-by-case basis by the carrier. In more difficult cases, however, the Health Care Financing Administration (HCFA), a component of the Department of Health & Human Services (HHS), will make an assessment and then issue a "national coverage determination" clearly indicating to the carriers whether the particular item should be considered covered or not. National coverage determinations issued by HCFA are published in the Part B Carriers Manual (the Manual) and are therefore binding on the carriers

and their hearing officers. 42 C.F.R. § 405.860.

In making its assessment of reasonableness and necessity HCFA often relies on the Public Health Service (PHS) for an evaluation of the safety and effectiveness of a particular service and the extent to which it has been accepted by the medical community. Within PHS, every review of this kind is undertaken by the Office of Health Technology Assessment (OHTA) of the National Center for Health Services Research and Health Care Technology Assessment (NCHSRHCTA). OHTA usually places a notice in the Federal Register announcing that an assessment is underway and soliciting comments from interested parties. During the assessment process OHTA also seeks information and recommendations from governmental agencies such as the National Institutes of Health (NIH) and the Food and Drug Administration (FDA). OHTA also consults with professional organizations and medical specialty groups to determine whether the procedure is generally accepted by the medical community as being safe and effective, and conducts a review of the medical literature. HCFA then issues a national coverage determination based on its consideration of PHS's recommendations.

### B.

The service at issue here, chelation therapy, is a treatment for atherosclerosis (obstructed arteries). The treatment consists of intravenous injections of disodium edetate solution. Proponents of the treatment believe that the disodium edetate, which binds ("chelates") with calcium, removes the calcium-containing plaque that clogs arteries. According to the government, however, this treatment has been widely discredited by the general medical community as being ineffective and unsafe.

An examination of the record indicates that as early as 1970, HCFA had issued instructions restricting Medicare coverage of disodium edetate to treatment for hypercalcemia, ventricular arrhythmias, heart block associated with digitalis toxicity and scleroderma. This position was apparently embraced at the urging of PHS, which had consulted with various medical organizations and the FDA. As early as 1970 the FDA-approved labeling for the drug stated that disodium edetate was indicated for the severe conditions mentioned above, but not "for the treatment of generalized arteriosclerosis associated with advancing age." 35 Fed.Reg. 437,438 (January 13, 1970).

The HCFA instructions on disodium edetate remained in effect until 1980, when HCFA replaced most specific drug coverage determinations with general criteria for intermediary and carrier use in determining coverage. The new 1980 criteria permitted payment for any use of an FDA-approved drug determined by the carrier to be reasonable and necessary, except for those uses specifically disapproved by the FDA or for which coverage might be precluded by a national instruction.

Subsequent to the issuance of the 1980 Carriers Manual, HCFA requested that NCHSRHCTA review chelation therapy and make a recommendation as to Medicare coverage. NCHSRHCTA published a notice in the Federal Register announcing its planned assessment and requesting interested parties to submit relevant information. 45 Fed.Reg. 41,222 (June 18, 1980). NCHSRHCTA additionally sought evaluations of chelation therapy from a number of professional organizations and medical specialty groups. As a result of this notice a large number of opinions by physicians and various medical organizations were obtained. Based on this information, NCHSRHCTA issued a comprehensive report and assessment recommending that the Medicare program not cover chelation therapy.

HCFA responded to the assessment by issuing a national coverage determination in February 1982 instructing intermediaries and carriers not to pay for chelation therapy under Medicare. These instructions appeared at two places in the Carriers Manual, in the treatment portion and in the drug portion:

35–64 Chelation Therapy for Treatment of Atherosclerosis—Not Covered (Effective date: *March 15, 1982* )

Chelation therapy is the application of chelation techniques for the therapeutic or preventive effects of removing unwanted metal ions from the body. The application of chelation therapy using ethylenediamine-tetra-acetic acid (EDTA) for the treatment and prevention of atherosclerosis is controversial. There is no widely accepted rationale to explain the beneficial effects attributed to this therapy. Its safety is questioned and its clinical effectiveness has never been established by well designed, controlled clinical trials. It is not widely accepted and practiced by American physicians. EDTA chelation therapy for atherosclerosis is considered experimental. For these reasons, EDTA chelation therapy for the treatment or prevention of atherosclerosis is *not covered.*

Some practitioners refer to this therapy as chemoendarterectomy and may also show a diagnosis other than atherosclerosis, such as arteriosclerosis or calcinosis. Claims employing such variant terms should also be denied under this section.

45–20 Ethylenediamine–Tetra–Acetic (EDTA) Chelation Therapy for Treatment of Atherosclerosis—Not Covered (Effective date: *March 15, 1982*)

The use of EDTA as a chelating agent to treat atherosclerosis, arteriosclerosis, clacinosis, or similar generalized condition not listed by the FDA as an approved use is not covered. Any such use of EDTA is considered experimental.

II.

The plaintiff Michael J. Friedrich, a Medicare Part B beneficiary, requested reimbursement for expenses related to chelation therapy. Friedrich received these treatments in February, March and April of 1983. The total cost of these services was $410.70. The plaintiff's insurance carrier, Nationwide Mutual Insurance (Nationwide) refused to reimburse the claimant for these expenses.

On May 19, 1983, plaintiff filed a claim with Nationwide seeking review of the earlier denial of his claim. The plaintiff's claim was again denied by letter on June 24, 1983. On July 25, 1983, Friedrich requested a carrier hearing review. This hearing was held on March 19, 1984. At the hearing both the plaintiff and his physician, Dr. Frackleton, testified as to the benefits of chelation therapy for the treatment of atherosclerosis. The witnesses also submitted written material. The Secretary offered no contrary evidence. On April 25, 1984, the hearing officer found that "[a]lthough the evidence and testimony presented at this hearing was impressive and implies the efficacy of chelation therapy as a viable alternative to conventional treatment for coronary artery disease, this does not alter the instructions contained in the carrier's manual that EDTA chelation therapy for the treatment or prevention of atherosclerosis is not covered." Reimbursement was denied on this basis.

Friedrich appealed this decision to the district court by filing a complaint and an amended complaint in November 1984. The Secretary responded and later filed a motion for judgment on the pleadings questioning federal jurisdiction. By agreement of the parties, the case was assigned to a magistrate for trial and decision. On May 1, 1987, the magistrate determined that he had jurisdiction to hear the case. He then proceeded to consider cross-motions for summary judgment subsequently filed by the parties. In his Memorandum and Order dated January 10, 1989, the magistrate found for the plaintiff.

The plaintiff had argued that the Secretary's instructions violate the Administrative Procedure Act's "notice and comment" requirements. 5 U.S.C. § 553. The defendant, on the other hand, argued that the magistrate was prevented from ruling that the Secretary's order was invalid because a provision of the Omnibus Budget Reduction Act of 1986 (OBRA), which amended the Medicare Act, precludes overturning national coverage determinations on the basis of a failure to conform to the notice and comment requirements of the APA. The magistrate, however, found that the OBRA is not applicable in this case because by its own language it only applies to "items or

services furnished on or after January 1, 1987." Pub.L. No. 99–509, § 9341(b), 100 Stat. 1874, 2037–38 (1986); see also 42 U.S.C. § 1395ff (1982 Ed. and Supp. V) (note regarding effective date of 1986 amendment). Since the plaintiff's chelation therapy was administered well before January 1, 1987, the magistrate concluded that he was not barred from overturning the Secretary's decision in this case.

The magistrate also noted that the OBRA contains a provision exempting from challenge rules or instructions associated with payment determinations issued before January 1, 1981. 42 U.S.C. § 1395ff(b)(4). This provision was found to be ineffective as to the challenged instructions because they were issued after January 1, 1981. In fact, they were issued on March 15, 1982.

The magistrate further held, for essentially the same reasons, that the OBRA did not preclude federal jurisdiction of the issue, citing *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986), which held that judicial review of a carrier's Part B benefit determination is available when a beneficiary challenges the validity of the regulation or instructions upon which the carrier's determination is based.

The magistrate then went on to hold that APA provisions requiring publication of proposed agency rules of a substantive nature in the Federal Register, followed by a public comment period prior to promulgating the proposed rule had been violated by the Secretary's determination. The magistrate concluded that the Secretary's rule was substantive, not interpretative, because it effected a change in existing law and policy.

The magistrate also found that the mandatory application of the 1982 instructions to the plaintiff's claims violated due process. He based this holding on the finding that the plaintiff had been deprived of a meaningful opportunity to present his case and of his right to a detached and neutral decision maker because the carrier hearing officer was bound by the "invalid" chelation therapy instruction.

The district court remanded the case for another hearing to determine whether Friedrich's claim should be honored under Part B of Medicare without considering the Secretary's instruction. HHS now appeals claiming that the district court erred in holding invalid the Secretary's national coverage determination barring Medicare payments for chelation therapy and in finding that the plaintiff was denied due process at his review hearing.

The parties have raised the same issues here as in the district court with somewhat expanded arguments and additional citations. We will discuss their positions as required for a decision.

### III.

Disposing of the jurisdictional issue first, we agree with the magistrate that the district court did have jurisdiction over this case. In the absence of a showing of clear congressional intent to the contrary, there is a "strong presumption" in favor of judicial review of administrative action. *Bowen v. Michigan Academy*, 486 U.S. at 670, 106 S.Ct. at 2135. The Secretary contends that section 9341(a)(1) of OBRA placed explicit limitations on court review of national coverage determinations, thus overcoming the presumption. He relies on two subsections of section 9341(a)(1)(D), codified as 42 U.S.C. § 1395ff(b)(3) and (4) (1982 Ed. and Supp. V):

(3) Review of any national coverage determination under section 1395y(a)(1) of this title respecting whether or not a particular type or class of items or services is covered under this subchapter shall be subject to the following limitations:

\* \* \* \* \* \*

(B) Such a determination shall not be held unlawful or set aside on the ground that a requirement of section 553 of title 5 or section 1395hh(b) of this title, relating to publication in the Federal Register or opportunity for public comment, was not satisfied.

\* \* \* \* \* \*

(4) A regulation or instruction which relates to a method for determining the amount of payment under part B of this subchapter and which was initially issued before January 1, 1981, shall not be subject to judicial review.

Neither of these provisions applies to this case. Subsection (4) by its terms applies only to regulations or instructions issued before January 1, 1981. The national coverage determination of concern here was issued in 1982. It is true that subsection (3)(B) restricts judicial review by providing that a national coverage determination shall not be held unlawful on the ground that the Secretary has failed to comply with the notice and comment requirements of the APA. Section 9341(b) of OBRA states, however, that the amendments made by the subsection "shall apply [only] to items and services furnished on or after January 1, 1987." The plaintiff sought reimbursement only for services furnished prior to that date.

While conceding that the provisions limiting judicial review are not retroactive, the Secretary argues that we should apply them to pending cases, such as that of the plaintiff. We find no merit in this argument. Congress could have made the amendments applicable to pending cases, but chose an effective date in the future, and we are bound by that legislative decision. The district court had jurisdiction over this action.

## IV.

■ Assuming the district court had jurisdiction, the Secretary contends that the national coverage determination that chelation therapy is not covered for Medicare reimbursement is valid, and that the district court erred in setting it aside for failure to comply with the requirements of the APA.

## A.

The APA requires notice of proposed rule making and an opportunity for interested persons to participate. 5 U.S.C. §§ 553, 556. There is an exception to the notice and hearing requirements, however, for "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice...." 5 U.S.C. § 553(b)(A). The Secretary maintains that the national coverage determination relating to chelation therapy is an interpretative rule, the purpose of which is to define the application to one particular procedure of the general statutory requirement that Medicare covers only those services considered "reasonable and necessary" in the diagnosis or treatment of an illness. 42 U.S.C. § 1395y(a)(1). The district court concluded that the determination is a "legislative" or "substantive" rule, and thus not within the exception relied upon by the Secretary.

We have discovered no bright line that separates the two types of rules. The United States Court of Appeals for the District of Columbia, because of its heavy administrative law caseload, has dealt with this issue in many decisions. Yet, that court has stated that the distinction between the two types of rules is " 'enshrouded in considerable smog.' " *General Motors Corp. v. Ruckelshaus*, 742 F.2d 1561, 1565 (D.C.Cir.1984) (quoting two earlier decisions), *cert. denied*, 471 U.S. 1074, 105 S.Ct. 2153, 85 L.Ed.2d 509 (1985). The court attempted to penetrate this smog in *General Motors* by identifying "certain general principles" that may assist a court in determining whether a particular rule is legislative or interpretative. *Id.* The court stated these principles as follows:

First, the agency's own label, while relevant, is not dispositive.... An interpretative rule simply states what the administrative agency thinks the statute means, and only " 'reminds' affected parties of existing duties." ... On the other hand, if by its action the agency intends to create new law, rights or duties, the rule is properly considered to be a legislative rule.

*Id.* (Citations omitted). This court has stated its agreement with this approach in *State of Ohio Department of Human Services v. United States Department of Health & Human Services*, 862 F.2d 1228, 1234 (6th Cir.1988), and *State of Michigan*

*v. Thomas,* 805 F.2d 176, 182–83 (6th Cir. 1986). Applying these principles, the court found the rule in *State of Ohio* to be legislative and the rule in *Thomas* to be interpretative.

The *General Motors* court noted that the agency involved had characterized the rule as interpretative. 742 F.2d at 1565. The Secretary has treated the determination as interpretative in the present case. Such a characterization is important, though not conclusive in determining the true nature of a rule. *Levesque v. Block,* 723 F.2d 175, 182 (1st Cir.1983); *American Postal Workers Union v. United States Postal Service,* 707 F.2d 548, 559 (D.C.Cir.1983), *cert. denied,* 465 U.S. 1100, 104 S.Ct. 1594, 80 L.Ed.2d 126 (1984). The court in *General Motors* found it "most important[ ]" that the rule it was considering created no "new rights or duties; instead, it simply restated the consistent practice of the agency...." 742 F.2d at 1565.

### B.

The plaintiff argues that the chelation therapy determination represented a departure from Medicare's general policy with respect to coverage. It argues that the general policy is to treat drugs approved for marketing by the FDA as satisfying the statutory "reasonable and necessary" requirement for Medicare reimbursement. He emphasizes the fact that a passage in the Manual states that the disqualification of chelation therapy is an exception to Medicare's general policy on coverage of drugs. The same statement continues, however, by stating that the general rule is to treat FDA-approved drugs prescribed by a physician as covered "if the Medicare contractor determines the use is reasonable and necessary...." The Secretary asserts that the purpose of the determination was to restate the Department's consistent policy that, though considered reasonable and necessary for treatment of some illnesses, chelation therapy does not satisfy this statutory requirement when used for the treatment of atherosclerosis.

The record reveals that as early as 1970 the Department of Health, Education and Welfare had advised by notices in the Federal Register that disodium edetate was not considered effective for the treatment of generalized arteriosclerosis. (Atherosclerosis is a stage of the chronic disease arteriosclerosis). The Secretary states that this has been the consistent position of the Department and that the 1982 national coverage determination did not represent a change of position.

In 1980 the Secretary began the practice of examining some drugs individually rather than qualifying all FDA-approved drugs if they were found by the Part B carriers to be reasonable and necessary. The 1982 determination implemented this new policy. In effect, it made the determination of reasonableness and necessity with respect to a particular use of chelation therapy rather than leaving that determination to the carriers. The Secretary states that in doing so, he created no new rights or duties; he merely applied the statutory requirements to a particular use of a given drug and method of treatment. The "new policy" referred to in the Manual is the *method* of dealing with FDA-approved drugs, not a new policy with respect to the reasonableness or necessity for use of chelation therapy in the treatment of atherosclerosis.

The plaintiff insists that the Secretary has not followed a consistent policy of denying Medicare coverage for chelation therapy. He cites a 1975 decision of the Appeals Council finding chelation therapy reasonable and necessary under Part A of the Medicare program for the treatment of atherosclerosis. We agree with the Secretary that this single decision by the Appeals Council is not significant. The Appeals Council made this decision in considering an individual claim for Part A reimbursement. In deciding the individual Part A claim the Appeals Council was not bound in any way by the instructions to carriers in deciding claims under Part B. The Appeals Council decision was not a " 'contemporaneous expression of opinion by [a] low-ranking official[ ],' " which courts have found " 'highly relevant and material evidence of the general understanding of ambiguous regulatory provisions.' " *State of Ohio,*

862 F.2d at 1235 (citations omitted). Rather it was a discrete decision made totally apart from the policy-making functions of the Secretary. The record as a whole convinces us that the Secretary has been consistent in his determination that Chelation therapy is not reasonable and necessary for the diagnosis or treatment of atherosclerosis. Thus the 1982 determination did not represent a departure from a previous evaluation of this medical procedure.

The plaintiff also contends that the determination should be considered legislative or substantive because it has a substantial impact on a large number of Medicare beneficiaries. At an earlier time, substantial impact was treated by a number of courts as an important factor in deciding whether a rule was legislative or interpretative. More recent cases have held that the level of impact on interested parties is not a factor in correctly classifying a rule or regulation. *E.g., Postal Workers,* 707 F.2d at 560. This court recognized the substantial impact argument in *State of Ohio,* 862 F.2d at 1233–34, but chose not to make impact a basis for its characterization of the rule it was considering. We think this approach is sound in the present case. Any determination by the Secretary regarding rules for Medicare reimbursement eligibility, regardless of how it is promulgated, will have a substantial impact on a large number of people. The extent of the impact is not an indicative factor in our search for the proper characterization of the national coverage determination.

Finally, the plaintiff argues that the national coverage determination is a substantive or legislative rule because it "fills the gaps" in the Medicare Act. We cannot perceive how the determination may be considered a "gap-filling" rule. The statute does not list some medical procedures as qualifying and leave it to the Secretary to supplement the list. Rather, it prescribes a test for determining what procedures qualify—those that are reasonable and necessary. The Secretary's role is not to fill in gaps, but to apply the statutory standard to an enormous number of modern medical practices. Thus, the plaintiff's reliance on *Mason General Hospital v.*

*Secretary of Health and Human Services,* 809 F.2d 1220 (6th Cir.1987), is misplaced, since that case involved agency rulemaking intended to fill in the spaces left by a complex legislative scheme.

## C.

As previously noted, this court has applied the "general principles" enunciated by the D.C. Circuit in two recent cases with opposite results. In *State of Ohio,* the court found that a regulation establishing a "maintenance amount ceiling" for allocation of Medicaid funds was a legislative rule. Since the rule had not been promulgated in accordance with the APA's notice and comment requirements, the court found it invalid. The rule in question was issued in 1978 and the Department of Health & Human Services argued that it was interpretative because it only made explicit what had been implicit all along in a 1974 regulation. The state relied heavily on the fact that the Department had approved Ohio's "family budgeting system" in 1974, acting under the original regulation. The budgetary system approved in 1974 was inconsistent with the 1978 regulation, and indicated that the 1978 view concerning "maintenance amount ceiling" was not implicit in the 1974 regulation.

The court concluded that the 1978 regulation did not "remind" states of a pre-existing limitation on the application of funds, but mandated a new limitation. Rather than interpreting the meaning of an existing regulation, it imposed a new ceiling of its own force. 862 F.2d at 1234. The court found the 1974 approval significant as a contemporaneous interpretation of the then current regulation. This inconsistent treatment of two state submissions in *State of Ohio* was quite different from the alleged inconsistency relied upon by the plaintiff in the present case. In *State of Ohio,* the setting in which the Department made two inconsistent interpretations of a regulation was the same. In 1974, HHS approved the state's submission of a family budgeting system and in 1978 the agency refused to approve the submitted family budgeting system which was based on the same inter-

pretation of the 1974 regulation that had led to approval in 1974. The court found this inconsistency telling in its conclusion that HHS did much more in 1978 than interpret its 1974 regulation. On the other hand, the isolated Appeals Council decision adverted to by Friedrich was made in a totally different setting and indicated no inconsistency or break with an earlier position of the Secretary.

*State of Michigan v. Thomas* involved rules proposed by Michigan to control fugitive dust emissions. The Environmental Protection Agency (EPA) disapproved the proposal, and Michigan, along with a number of affected industries, petitioned this court for review of EPA's action. EPA's disapproval was in the form of a final rule which it issued without following the APA's notice and comment requirements. Citing *General Motors*, this court held that the rule in question was interpretative rather than legislative. It did not "create any new law, rights or duties." 805 F.2d at 183.

### D.

This is a difficult case and not totally like any other we have been cited to or discovered. The Medicare program covers the full range of modern medicine and pharmacology. It is comprehensive and operates through a complex structure. National standards are essential if there is to be uniformity and equality in the administration of Medicare. The Secretary has chosen to seek uniformity by requiring Part B carriers to abide by all regulations in the Manual. It is inconceivable to us that the Secretary might be required to comply with the full panoply of APA notice and comment requirements in promulgating national standards for individual drugs and medical procedures. This is a classic case of a rule that fits perfectly the "common theme" of the § 553(b)(A) exception for rules that " 'accommodate situations where the policies promoted by public participation in rulemaking are outweighed by the countervailing considerations of effectiveness, efficiency, expedition and reduction in expense.' " *American Hospital As-*

*sociation v. Bowen*, 834 F.2d 1037, 1045 (D.C.Cir.1987), quoting *Guardian Federal Savings & Loan Association v. Federal Savings & Loan Insurance Corp.*, 589 F.2d 658, 662 (D.C.Cir.1978).

The Medicare Act mandates that only reasonable and necessary medical services are reimbursable. The national coverage determination does not "fill the gaps" in the statute, *Postal Workers*, 707 F.2d at 559, or "supplement" it, *United Technologies Corp. v. United States Environmental Protection Agency*, 821 F.2d 714, 719 (D.C.Cir.1987). Thus, it creates no new law. Rather, it interprets the statutory language "reasonable and necessary" as applied to a particular medical service or method of treatment. The district court erred in concluding that the determination is a legislative rule and therefore is invalid for failure of the Secretary to comply with the requirements of 5 U.S.C. § 553(b).

Having decided that the determination is within the APA's exception, we do not address the Secretary's argument that the procedures followed in implementing the regulation were the "functional equivalent" of notice and comment under the APA, or that Congress "endorsed" the Secretary's procedures for promulgating national coverage determinations by enacting in OBRA a prospective limitation on judicial review of such regulations.

### V.

■ The magistrate held that the plaintiff was denied due process because the hearing officer was bound by invalid instructions based on the national coverage determination, stating:

Friedrich was not given a meaningful opportunity. The hearing officer, though permitting Friedrich to offer evidence that his chelation therapy was medically reasonable, did not actually consider this evidence. The hearing officer was bound by the chelation therapy instructions of the carrier's manual. As noted earlier, these instructions were invalid. A meaningful opportunity in this case requires that the hearing officer rule on Friedrich's chelation therapy

claim without considering the instructions.

We have found that the determination was valid. Thus, this ground for holding that the hearing abridged the plaintiff's right to due process is eliminated.

The magistrate also appears to have held that due process requires a hearing at which the officer is free to make a determination of coverage free of any binding instructions in the Manual, valid or invalid. We disagree.

The first step in deciding a procedural due process claim is to identify the interest to which the due process attaches. Here, Friedrich claimed a property interest in Medicare benefits and the magistrate agreed that he had such an interest. The Supreme Court has defined those property interests entitled to constitutional protection as "more than a unilateral expectation;" instead, a claimant must have "a legitimate claim of entitlement" to property. *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). The only legitimate claim of entitlement under Medicare is to those services that are reasonable and necessary. 42 U.S.C. § 1395y(a)(1). There is no legitimate claim of entitlement to a given medical procedure just because a doctor prescribes it or a patient requests it.

The record in this case reveals that the plaintiff had no more than a unilateral expectation that he would receive reimbursement under the Medicare program for chelation therapy. As we have noted, on advice of the PHS and others, the Secretary has ruled consistently since 1970 that this procedure is not safe and effective for the treatment of atherosclerosis. The various Federal Register notices and publications have consistently found that there is little support in the medical community for this course of treatment, and that at best it must be considered experimental. The change in the Secretary's method of evaluating medical procedures in 1980 did not produce a change in his position concerning chelation therapy. There was no basis for a legitimate claim of entitlement to this treatment since it had never been deemed "reasonable and necessary."

The record discloses that NCHSRHCTA received and considered large volumes of material, mostly anecdotal, in favor of chelation therapy before HCFA made its final evaluation and issued the national coverage determination in February 1982. We have found the evaluation procedure valid as meeting the requirements for promulgation of an interpretative rule. Friedrich does not have a due process right to have his individual claim considered *de novo* in the face of the Secretary's determination. Having made a national coverage determination, the Secretary is not required to defend it in response to individual claims by every person who disagrees with the decision to deny coverage. The fact that the hearing officer was bound by the determination did not deny Friedrich process to which he was due.

The judgment of the district court is reversed with directions to dismiss the complaint.