*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0067P (6th Cir.)
File Name: 00a0067p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

St. Francis Health Care Centre,

    *Plaintiff-Appellant,*

    *v.*

Donna Shalala,

    *Defendant-Appellee.*



No. 98-3965

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 97-07559—David A. Katz, District Judge.

Argued: October 25, 1999

Decided and Filed: February 25, 2000

Before: JONES, MOORE, and GILMAN, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Dennis P. Witherell, SHUMAKER, LOOP & KENDRICK, Toledo, Ohio, for Appellant. Ted Yasuda, U.S. DEPARTMENT OF HEALTH & HUMAN SERVICES, OFFICE OF THE GENERAL COUNSEL, REGION V, Chicago, Illinois, for Appellee. **ON BRIEF:** Dennis P.

1

Witherell, Jenifer A. Belt, SHUMAKER, LOOP & KENDRICK, Toledo, Ohio, for Appellant. Ted Yasuda, U.S. DEPARTMENT OF HEALTH & HUMAN SERVICES, OFFICE OF THE GENERAL COUNSEL, REGION V, Chicago, Illinois, for Appellee.

JONES, J., delivered the opinion of the court, in which MOORE, J., joined. GILMAN, J. (pp. 20-27), delivered a separate dissenting opinion.

_____

**OPINION**

_____

NATHANIEL R. JONES, Circuit Judge.    Plaintiff-Appellant St. Francis Health Care Centre ("St. Francis") appeals the district court's grant of summary judgment for Defendant-Appellee Donna Shalala, Secretary of the Department of Health and Human Services ("Secretary"). St. Francis contends that the Secretary erred in denying its request for Medicare reimbursement for the provision of hospital-based skilled nursing services. For the reasons stated herein, we **AFFIRM**.

## I.

### A.

St. Francis operates a rehabilitation hospital, a hospital-based skilled nursing facility ("HB-SNF"), a general nursing facility, and a transitional living center in rural Ohio. Only St. Francis's HB-SNF is relevant for purposes of this appeal. The goal of St. Francis's HB-SNF is to rehabilitate, rather than simply maintain patients. Thus, St. Francis routinely provides "comprehensive rehabilitation therapy" for the vast majority of its patients. Although St. Francis's intensive rehabilitation therapy results in higher per diem costs per patient compared to its peers, this therapy also results in shorter patient stays. Thus, a patient's total costs are less than they would be at other facilities.

I would therefore reverse the grant of summary judgment for the Secretary and remand with instructions to enter judgment in favor of St. Francis. Because I would reverse the trial court's disposition on the ground discussed above, I find no need to reach the other issues covered in the majority's opinion.

The majority also attempts to construe the PRM rule as an interpretation of the requirement in 42 C.F.R. § 413.30 that a provider's costs be "reasonable." It views the rule as a parallel provision to the two-tier system established by 42 U.S.C. § 1395yy. That system reduced the cost limit for HB-SNFs from Level 3 to Level 2, establishing a "discount factor" to account for what Congress found to be their relative inefficiency as compared to FS-SNFs. In the majority's opinion, the PRM rule similarly factors in the alleged inefficiency of HB-SNFs and discounts reimbursement for atypical services accordingly. See Op. at 15-16.

Closer analysis reveals that the PRM rule is not analogous to the two-tier system. The PRM rule does not function as a commonly understood "discount factor," because it completely denies compensation for the first amounts spent on atypical services. In other words, an HB-SNF that spends $100 to provide routine services and anywhere from $1 to $20 on atypical services will receive no reimbursement at all for its atypical service costs. These expenditures are arbitrarily deemed to be 100% *in*efficient or, alternatively, are subjected to a 100% "discount factor." To the extent that the same hospital raises its atypical costs above $20, however, it will be compensated for those costs. I find it unpersuasive to construe these results as a "discount factor" or a measure of "reasonableness."

Because the PRM rule should be regarded as more substantive than interpretive, and because it was enacted without notice and comment, the rule should be declared invalid. Contrary to the majority's fears, such a result would not necessarily require the Secretary to conduct a case-by-case review of every provider's reimbursement request. The Secretary is free to establish guidelines that will presumptively determine a provider's eligibility for upward adjustments, thereby relieving her agency of the burden of case-by-case analyses. Those guidelines must, however, be consistent with the dictates of the governing regulation, or they must be enacted pursuant to the notice and comment procedures of the APA.

Like many health care facilities, a number of St. Francis's patients are Medicare recipients. Consequently, Medicare reimburses St. Francis for the reasonable costs of services provided to Medicare patients.[1] *See* 42 U.S.C. § 1395x(u) & (v)(1)(A). Pursuant to Medicare rules and regulations, from 1983 to 1990, St. Francis was reimbursed for such reasonable actual costs of services provided. Because St. Francis's actual costs exceeded the statutory routine cost limits ("RCLs") for each of these years, St. Francis requested, and was granted, an "upward adjustment" to its cost limits. However, in the 1991 and 1992 cost reporting periods, the Medicare intermediary denied St. Francis's requests for an "upward adjustment."[2] St. Francis appealed to the Provider Reimbursement Review Board ("PRRB"), which reversed the intermediary's decision. Thereafter, the Administrator of the Health Care Financing Administration ("HCFA"), the Secretary's delegate, reviewed and reversed the PRRB's decision. Pursuant to 42 U.S.C. § 1395oo(f)(1), St. Francis thereafter filed a Complaint in federal district court seeking review of the HCFA's decision. St. Francis and the Secretary filed cross motions for summary judgment. The district court denied St. Francis's motion, and granted the Secretary's

---

[1]The initial decision of whether the health care provider should be reimbursed is made by an "intermediary," which is usually a private health insurance company. On a yearly basis, the intermediary determines the amount which Medicare must reimburse the provider in accordance with Medicare policies and procedures. *See* 42 U.S.C. §§ 1395g, 1395h(c)(1).

[2]The 1991 and 1992 per diem amounts were as follows. The terminology used in this footnote is explained *infra*:

|  | 1991 | 1992 |
|---|---|---|
| St. Francis's Actual Costs | $120.94 | $139.06 |
| 112% of Mean HB-SNF Costs | $136.11 | $143.98 |
| HB-SNF Statutory RCL | $110.58 | $116.90 |

J.A. at 120-21. The Secretary concluded that "[s]ince [St. Francis's] cost per day is less than the uniform peer group cost, no exception is allowed." J.A. at 442.

motion. *See St. Francis Health Care Centre v. Shalala*, 10 F.Supp.2d 887 (N.D. Ohio 1998). This timely appeal ensued.

### B.

The Medicare reimbursement plan developed by Congress has been refined over the years by Congress and the Secretary. Beginning in 1972, Congress, faced with rising Medicare costs, recognized that the original cost-based Medicare payment structure provided little incentive for providers to operate efficiently. Congress amended the Medicare Act to provide that "reasonable costs" reimbursable under Medicare should exclude "any part of incurred cost found to be unnecessary in the efficient delivery of needed health services." 42 U.S.C. § 1395x(v)(1)(A).

The original cost limits which HCFA established categorized SNFs as free-standing or hospital-based and as urban or rural, and permitted reimbursement for SNFs for up to 115% of the mean cost of their respective category, or "peer group." HCFA subsequently reduced the cost limit to 112% of the peer group mean costs. Therefore, while each facility was entitled to receive 112% of its peer group mean costs, the four types had different peer group means, and therefore each type of facility had a different cost limit. The cost limits for HB-SNFs were significantly higher than for free-standing SNFs (FS-SNFs). Advocates of separate cost limits argued that HB-SNFs incurred higher costs because of the more intensive care they rendered, justifying higher cost limits. However, opponents argued that all SNFs provide the same standard of care and separate cost limits were not warranted.

Congress, aware of results from several studies of the higher HB-SNF costs,[3] enacted the Deficit Reduction Act

---

[3]Several studies concluded that only 50% of the cost difference between HB-SNFs and FS-SNFs was attributable to variations in the intensity of care or case-mix. Inefficiency was deemed the likely cause of the other 50% of the cost difference.

When an agency functions as an adjudicative body, it is under no obligation to act with consistency or to provide notice and an opportunity for comment by interested parties. *See Michigan v. Thomas*, 805 F.2d at 184 ("An administrative agency may reexamine its prior decisions and may depart from its precedents provided the departure is explicitly and rationally justified."). Because the PRM rule under consideration is a legislative enactment rather than an adjudicative order, any modifications that it makes to prior regulations are required to have been preceded by notice and comment. *See* 5 U.S.C. § 553.

### B. The PRM rule cannot be construed as an "interpretation" of 42 C.F.R. § 413.30

The majority concludes that by denying compensation to HB-SNFs for the costs of atypical services below Level 3, the PRM rule simply fleshes out the meaning of the terms "reasonableness" of costs and "typicality" of services contained in 42 C.F.R. § 413.30. Op. at 14. I respectfully disagree.

The regulation in question, 42 C.F.R. § 413.30, allows providers to seek compensation for "items or services [that] are atypical in nature and scope." In denying compensation for costs that do not exceed Level 3, the PRM rule seemingly confuses atypical *costs* with atypical *services*. The fact that a provider's costs are atypically high does not necessarily mean that it is providing atypical services. Conversely, the fact that a hospital has below-average costs does not necessarily establish the absence of atypical services.

The facts underlying the present case confirm this point, because it is undisputed that St. Francis provided atypical services at a cost below Level 3 for the years in question. There is thus a critical difference between atypical costs and atypical services. The PRM rule, which focuses on atypical costs, does not define or flesh out the meaning of the atypical services referred to in the prior regulation.

that a rule was substantive, in part, because it was "mandatory, not advisory"); *Guardian Fed. Sav. & Loan Ass'n v. Federal Sav. Loan Ins. Corp.*, 589 F.2d 658, 666-67 (D.C. Cir. 1978) ("If it appears that a so-called policy statement is in purpose or likely effect one that narrowly limits administrative discretion, it will be taken for what it is—a binding rule of substantive law.").

The Secretary argues that "nothing forbids an agency from changing its interpretations." I do not quarrel with the proposition that an agency may change its rulings or interpretations over time. An agency is not free, however, to adopt new substantive regulations without notice and comment. Indeed, in both cases cited by the Secretary in which an agency modified its regulations, the change was preceded by notice and comment. *See American Trucking Ass'ns. v. A.T. & S.F. Ry. Co.*, 387 U.S. 397, 404 (1967) (allowing the Interstate Commerce Commission to adopt rules, pursuant to notice and comment, which altered its previous policies regarding trailer-on-flatcar service); *Western Coal Traffic League v. United States*, 719 F.2d 772, 777 (5th Cir. 1983) (allowing the Interstate Commerce Commission to change its methodology for evaluating a carrier's market dominance by enacting a new regulation pursuant to notice and comment).

In the remaining cases cited by the Secretary, the challenged modification was an adjudicative ruling as to a specific party rather than a general legislative rule. *See Montana Power Co. v. Environmental Protection Agency*, 608 F.2d 334, 347 (9th Cir. 1979) (affirming an Environmental Protection Agency order determining when construction of a power plant "commenced," even though the order was inconsistent with prior adjudicative rulings of the agency); *NLRB v. Local 103, Int'l Ass'n of Bridge, Structural and Ornamental Iron Workers*, 434 U.S. 335 (1978) (affirming a cease and desist order issued by the National Labor Relations Board to a striking, uncertified union, which the union alleged was inconsistent with a prior ruling of the agency).

(DEFRA), Pub. L. 98-369, § 2319(b), 98 Stat. 494 (1984). DEFRA added a new section to the Medicare Act which addressed the cost differences between HB- and FS-SNFs by adjusting the cost limits for the two groups. For HB-SNFs, instead of employing the previous 112% level (112% of the mean per diem costs of the peer group), Congress lowered that amount by 50% of the difference between the 112% level for HB-SNFs and FS-SNFs. (*ie.,* 50% ((112% x HB-SNF per diem costs) - (112% x FS-SNF per diem costs))). Still dissatisfied with the cost limits established by DEFRA, Congress has since enacted measures to contain costs further and to reduce the differing treatment of HB- and FS-SNFs; these latter changes post-date the events of this case, however.[4] Despite this plethora of changes to the medicare reimbursement plan, Congress has always left intact the Secretary's authority to make adjustments to cost limits "to the extent the Secretary deems appropriate." 42 U.S.C. § 1395yy(c).

## C.

With this legislative history in the background, this case involves a Medicare Act provision (42 U.S.C. § 1395yy(a)), a regulation interpreting that provision (42 C.F.R. § 413.30), and a PRM provision (PRM § 2534.5) interpreting the regulation.

---

[4]In the Omnibus Budget Reconciliation Act of 1993, Pub. L. 103-66, § 13503, 107 Stat. 379 (1993), Congress froze cost limits at the fiscal year 1993 levels for the next two fiscal years and eliminated the provision authorizing additional reimbursement to HB-SNFs for costs associated with the Medicare cost allocation process. This essentially rejected differing reimbursement for HB- and FS-SNFs.

More recently, in the Balanced Budget Act of 1997, Pub. L. 105-33, § 4432(a), 111 Stat. 258, 414-20 (1997), Congress eliminated the two-tiered system of cost limits as well as the retrospective cost-based reimbursement plan. In their place, Congress enacted a prospective payment system based on a federal per diem rate.

### 1. 42 U.S.C. § 1395yy: The Statutory Framework for Cost Limits

Congress established the RCLs to be applied to different SNFs in 42 U.S.C. § 1395yy:

The Secretary, in determining the amount of the payments which may be made under this subchapter with respect to routine service costs of extended care services shall not recognize as reasonable (in the efficient delivery of health services) per diem costs of such services to the extent that such per diem costs exceed the following per diem limits . . . .

42 U.S.C. § 1395yy(a). The provision then establishes that the RCL for FS-SNFs "shall be equal to" 112% of the "mean per diem routine service costs" of FS-SNFs. *Id.* at § 1395yy(a)(1). For HB-SNFs, the RCL "shall be equal to" the sum of the following: the FS-SNFs cost limit plus 50% of the amount by which 112% percent of the HB-SNFs mean per diem routine service cost exceeds the FS-SNFs cost limit. *Id.* at § 1395yy(a)(3). Despite these statutory limits, Congress, recognizing the Secretary's expertise in this area, afforded the Secretary the discretion to make "upward adjustments" to these statutory RCLs:

The Secretary may make adjustments in the limits set forth in subsection (a) of this section with respect to any skilled nursing facility [SNF] to the extent the Secretary deems appropriate, based upon case mix or circumstances beyond the control of the facility. The Secretary shall publish the data and criteria to be used for purposes of this subsection on an annual basis.

42 U.S.C. § 1395yy(c).

### 2. 42 C.F.R. § 413.30: The Secretary's Regulation for Adjusting Cost Limits

Pursuant to the discretion Congress afforded the Secretary in 42 U.S.C. § 1395yy(c), the Secretary implemented 42

all of their costs, including those costs above the applicable cost limit. Indeed, in the years prior to 1991, the Secretary routinely granted upward adjustments to St. Francis, reimbursing all of its direct expenditures for atypical services. Under the PRM rule, however, the Secretary no longer determines whether amounts spent on atypical services between Levels 2 and 3 should be compensated. The costs of such atypical services, even if they otherwise conform to the four requirements of 42 C.F.R. § 413.30(f), are never recoverable.

A rule that adds a new requirement to a set of existing requirements is substantive, and requires notice and comment before it can be enacted. *See Ohio Dep't of Human Svcs. v. Dep't of Health & Human Svcs.*, 862 F.2d 1228, 1235 (6th Cir. 1988) (holding that the department's adoption of a "maintenance amount ceiling" for noninstitutionalized spouses of institutionalized Medicaid recipients required notice and comment because it added a requirement that was not compelled by or implicit in the existing regulations); *see also Perales v. Sullivan*, 948 F.2d 1348, 1354 (2d Cir. 1991) (determining that a rule was substantive when it required state Medicaid submissions to provide assurance that the state possessed supporting documentation); *Linoz v. Heckler*, 800 F.2d 871, 877 (9th Cir. 1986) (concluding that a department provision excluding payment for ambulance service from one hospital to another solely to obtain the services of a specialty physician was a substantive rule where "instead of simply clarifying a pre-existing regulation, [it] carved out a per se exception"). The case of *Shalala v. Guernsey Memorial Hosp.*, 514 U.S. 87 (1995), upon which the majority relies, is consistent with the cases just cited. *See id.* at 100 ("We can agree that APA rulemaking would still be required if PRM § 233 adopted a new position inconsistent with any of the Secretary's existing regulations).

Moreover, other courts have held that rules like the PRM rule, which impose binding constraints on an agency's existing discretion, are generally considered substantive. *See Ohio Dep't of Human Svcs.*, 862 F.2d at 1234 (concluding

## II.  ANALYSIS

### A.   The PRM rule is substantive

This court has set out the following broad guidelines for determining the nature of an administrative rule:   "An interpretive rule simply states what the administrative agency means, and only reminds affected parties of existing duties. . . .  On the other hand, if by its action the agency intends to create new law, rights or duties, the rule is properly considered to be a legislative rule." *Michigan v. Thomas*, 805 F.2d 176, 182-83 (6th Cir. 1986) (citations and internal quotation marks omitted).  The exemption for interpretive rules must be narrowly construed by the courts in view of the important purposes served by the APA's procedural requirements. *See, e.g.*, *Caraballo v. Reich*, 11 F.3d 186, 195 (D.C. Cir. 1993).

In defending its conclusion that the PRM rule is interpretive rather than substantive, the majority emphasizes that the controlling statute, 42 U.S.C. § 1395yy, leaves the exemption-granting process to the Secretary's discretion.   Her department's prior regulation on the subject preserves that discretion, subject to the four requirements listed above. *See* 42 C.F.R. § 413.30(f).  The majority therefore maintains that the PRM rule is simply a guide to the Secretary's exercise of discretion.  It concludes that "the [PRM] rule does not effect new substantive reimbursement standards inconsistent with prior regulations—the central characteristic of a substantive rule."  Op. at 18.

I respectfully disagree.  At a minimum, the PRM rule adds a fifth, unwaivable requirement to the four reimbursement criteria set out in 42 C.F.R. § 413.30.  At a maximum, the PRM rule conflicts with the prior regulation.  In either case, it imposes new financial restrictions on the HB-SNFs that it regulates, thus requiring notice and comment prior to its enactment. *See* 5 U.S.C. § 553.

Before the PRM rule was promulgated, the Secretary was free to reimburse HB-SNFs that provided atypical services for

C.F.R. § 413.30, which "set[s] forth the general rules under which HCFA may establish limits on provider costs recognized as reasonable in determining Medicare program payments" and "also sets forth rules governing exemptions, exceptions, and adjustments to limits established under this section that HCFA may make as appropriate in consideration of special needs or situations of particular providers." *Id.* at § 413.30(a).  The regulation provides as follows:

\*\*\*

(a)(2) General principle.  Reimbursable provider costs may not exceed the costs estimated by HCFA to be necessary for the efficient delivery of needed health services.  HCFA may establish estimated cost limits for direct or indirect overall costs or for costs of specific items or services or groups of items or services.  These limits will be imposed prospectively and may be calculated on a per beneficiary, per admission, per discharge, per diem, per visit, or other basis.

\*\*\*

(f) Exceptions.  Limits established under this section *may* be adjusted upward for a provider under the circumstances specified in paragraphs (f)(1) through (f)(5) of this section.  An adjustment is made *only to the extent the costs are reasonable*, attributable to the circumstances specified, separately identified by the provider, and verified by the intermediary.

(1) *Atypical services*.  The provider can show that the–
(i) Actual cost of items or services furnished by a provider exceeds the applicable limit because *such items or services are atypical in nature and scope*, compared to the items or services generally furnished by providers similarly classified;  and
(ii) Atypical items or services are furnished because of the special needs of the patients treated and are necessary in the efficient delivery of needed health care.

42 C.F.R. § 413.30 (emphasis added).

### 3. PRM[5] § 2534.5

*a. The Provision*

In July 1994, HCFA established a new methodology for handling exception requests—the methodology which St. Francis challenges in this case.[6] The methodology is set forth in Transmittal No. 378, PRM § 2534.5 ("Determination of Reasonable Costs in Excess of Cost Limit or 112 percent of Mean Cost") and pertains to cost reporting periods after July 1, 1984:

In determining reasonable cost, the provider's per diem costs in excess of the cost limit are subject to a test for low occupancy and are compared to per diem costs of a peer group[7] of similarly classified providers.

\*\*\*

. . . With cost reporting periods beginning *prior to July 1, 1984,* for each free-standing group and each hospital-based group, each cost center's *ratio is applied to the cost limit* [*i.e.*, the RCL] applicable to the cost reporting period for which the exception is requested. For each *hospital-based group* with cost reporting periods beginning on or *after July 1, 1984*, the *ratio is applied to 112% of the group's mean per diem cost* (*not the cost limit*), adjusted by the wage index and cost reporting year

---

[5]The PRM, or Provider Reimbursement Manual, is a set of non-binding rules that the Secretary issues in order to provide guidance to providers and intermediaries and clarify the Secretary's reimbursement policies and regulations.

[6]While the exceptions at issue pertain to fiscal years 1991 and 1992, they are governed by PRM § 2534.5 because they were filed on August 22, 1994, and December 28, 1994.

[7]There are four different SNF peer groups: (1) Urban Hospital-based; (2) Urban Freestanding; (3) Rural Hospital-based; and (4) Rural Freestanding. *See* PRM § 2534.5(B). St. Francis's peer group is Urban Hospital-based.

---

Facilities that provide atypical services, which tend to be more expensive, may seek upward adjustments for expenditures above their cost limits. Under the reimbursement review process originally set up by 42 C.F.R. § 413.30(f), the Health Care Financing Administration granted upward adjustments to HB-SNFs that demonstrated that their costs were (1) reasonable, (2) attributable to atypical services, (3) separately identified, and (4) independently verified. *See* 42 C.F.R. § 413.30(f). In the years 1984-1990, St. Francis received full compensation under this regulation for its direct service costs that exceeded its cost limit, having demonstrated that its extra expenses were reasonable and legitimately due to the costs of providing atypical services. For example, if St. Francis's routine costs had averaged $100 per person per day during those years, and its atypical direct service costs had totaled $30 per day, then the facility would have recovered the $30 above its cost limit upon making the showing called for in the regulation.

The PRM rule changed this system. Under the PRM rule, St. Francis's atypical service expenditures are recoverable only to the extent that its total costs exceed Level 3. Using the same illustrative numbers as before, if St. Francis's routine service costs are $100 and its atypical service costs are $30, it would recover only $10 (($130 total costs)-($120 Level 3)) of the $30 it expended on atypical services. When a provider's total costs do not exceed Level 3, none of its atypical service costs are recoverable. Thus, in 1991 and 1992, when St. Francis's requests for an upward adjustment were evaluated under the PRM rule, the facility could not recover any of its expenditures above its cost limit (Level 2) because its total costs did not exceed Level 3. This was true even though the Secretary acknowledges that St. Francis's expenditures were legitimately spent for the provision of atypical services.

————————

**DISSENT**

————————

RONALD LEE GILMAN, Circuit Judge, dissenting. A fundamental requirement of the Administrative Procedure Act (APA) is that interested persons be given notice of proposed substantive regulations and an opportunity to comment. *See* 5 U.S.C. § 553. The majority concludes that the rule in question, Provider Reimbursement Manual § 2534.5 (the PRM rule), is exempt from the APA's notice and comment requirement because it is an "interpretive" rule. *See id.* § 553(b)(A). I believe that the PRM rule is substantive. Because the rule was enacted without notice and an opportunity for comment, it should therefore be declared invalid.

## I. BACKGROUND

As explained by the majority, the governing statute establishes different cost limits for free-standing versus hospital-based skilled nursing facilities. Free-standing skilled nursing facilities (FS-SNFs) have a cost limit equal to 112% of the mean per diem costs of all FS-SNFs, which the parties refer to as Level 1. The cost limit for hospital-based skilled nursing facilities (HB-SNFs) is computed through a two step process: first, one determines 112% of the mean per diem costs of all HB-SNFs, which the parties refer to as Level 3, and that number is then compared with Level 1. The amount midway between Levels 1 and 3 is the cost limit for HB-SNFs, which the parties refer to as Level 2. Thus, in the majority's illustrative scenario, $80 is Level 1, the cost limit for FS-SNFs, $120 is Level 3, equaling 112% of the average per diem cost of HB-SNFs, and $100 is Level 2, the cost limit for HB-SNFs. All of these numbers represent the average daily cost, per person, of operating various skilled nursing facilities.

adjustment factor applicable to the cost reporting period for which the exception is requested.

The SNF's actual per diem cost . . . is compared to the appropriate component of the disaggregated cost limit or 112 percent of the hospital-based mean per diem cost. If the SNF's per diem cost exceeds the peer group per diem cost for any cost center, the higher cost must be explained. Excess per diem costs which are not attributable to the circumstances upon which the exception is requested and cannot be justified may result in either a reduction in the amount of the exception or a denial of the exception.

PRM § 2534.5 (emphasis added). In short, for HB-SNF costs above the RCL, the methodology permits reimbursement for only those costs in excess of 112% of the mean per diem cost which are attributable to the HB-SNF's atypical services. The approach creates a "gap" between the HB-SNF RCL and the 112% level within which HB-SNFs cannot recover any of their costs above the RCL. It is the propriety of this "gap," as well as the consequences it has on facilities like St. Francis which happen to fall within it, which is at issue in this case.

### b. *Illustration of PRM § 2534.5*

Because the operation of the PRM is somewhat complex, the following illustration, provided by the district court, is helpful:

| | | |
|---|---|---|
| *Assume:* | FS-SNF statutory RCL | = 112% of the FS-SNF mean = $80 |
| *Assume:* | 112% of the HB-SNF mean | = $120 |
| *Then:* | HB-SNF statutory RCL | = 112% of the FS-SNF mean + 50%(112% of the HB-SNF mean - 112% of the FS-SNF mean) |
| | | = $80 + .50($120 - $80) = $80 + $20 |
| | | = $100 |

Based on the aforementioned statutory/regulatory language, a HB-SNF with the per diem actual costs listed below and the

RCLs directly above would be entitled to the corresponding maximum reimbursement rates:

|  | Actual Costs |  | Maximum Reimbursement |
|---|---|---|---|
|  | $150 |  | $130 |
|  | $140 |  | $120 |
|  | $130 |  | $110 |
| 112% of HB-SNF mean ($120) | $120 |  | $100 |
|  | $110 | <---(the "gap")--> | $100 |
| HB-SNF statutory RCL ($100) | $100 |  | $100 |
|  | $90 |  | $90 |
| 112% of FS-SNF mean ($80) | $80 |  | $80 |
| (*i.e.*, FS-SNF statutory RCL) |  |  |  |

Note that SNFs with actual costs between $100 (the HB-SNF RCL) and $120 (the 112% level), are only recompensed for $100 (the RCL amount). This is the "gap" St. Francis decries.

Another way to conceptualize this formula is that there are three possible categories of actual costs: the provider's actual costs can be (1) less than or equal to the statutory RCL; (2) greater than or equal to the statutory RCL but less than 112% of its peer group mean; or (3) greater than or equal to 112% of its peer group mean. Pursuant to PRM § 2534.5, if the provider's actual costs are less than or equal to the statutory RCL, the provider is reimbursed the full amount of its actual costs (category 1); if the provider's costs are greater than or equal to the statutory RCL, *but less than 112% of the HB-SNF mean*, the provider is *only* reimbursed in the amount of the statutory RCL (category 2); if the provider's costs are greater than or equal to 112% of the HB-SNF mean, the provider is reimbursed in the amount of the statutory RCL, *plus* any additional amount attributable to atypical services up to the total amount by which the actual costs exceed the 112% of the mean (category 3). Accordingly, category (2) represents a "gap" for which a provider will not be reimbursed above the RCL amount despite having costs above the RCL. That provider does not have the opportunity to show that its costs were reasonable and for atypical services.

anchored in its prior argument that PRM § 2534.5 "contradicts the plain language of the applicable regulation that it purports to interpret," St. Francis's Br. at 35, a contention with which we disagree. Similarly, the dissenting opinion's APA argument also emerges from its underlying view that the PRM cannot be considered an interpretation of 42 C.F.R. § 413.30 because it "confuses" the key terms of that regulation and is unrelated to the reasonableness of atypical service costs. Again, based on our discussion *supra* and in light of the deference owed to an agency interpreting its own regulations, we simply disagree with this conclusion. Thus, the Secretary was not required to comply with the APA's notice and comment procedures in issuing PRM § 2534.5.[11]

## IV.

Because we do not find PRM § 2534.5 to be an arbitrary or capricious interpretation of the statute and regulation at issue, we **AFFIRM.**

---

[11]We also find unpersuasive St. Francis's argument regarding the Secretary's "inconsistent" interpretation of its regulations. As this Court has stated, "[a]dministrative agencies are not bound by their own prior construction of a statute . . . . We therefore review the Commission's construction of the statute without regard to the shift it represents from [its] prior construction . . . ." *Crounse Corp. v. ICC*, 781 F.2d 1176, 1186 (6th Cir. 1986) (citing *NLRB v. Local Union No. 103, International Ass'n of Bridge, Structural & Ornamental Iron Workers*, 434 U.S. 335, 351 (1978) (stating that when an administrative agency "chang[es] its mind[,] the courts still sit in review of the administrative decision and should not approach the statutory construction issue de novo and without regard to the administrative understanding of the statutes")).

omitted).  Such rules "do not have the force and effect of law and are not accorded that weight in the adjudicatory process," and do not effect a "substantive change" which is inconsistent with existing regulations.  *Id.  See also Friedrich v. Secretary of HHS*, 894 F.2d 829 (6th Cir. 1990) (holding that a national coverage determination by the Secretary was an interpretive rule).  Lower court decisions looking at PRMs have been consistent with *Guernsey*, concluding that they are interpretive rules and do not require notice and comment rulemaking.  *See, e.g.*, *St. Mary's Hosp. v. Blue Cross & Blue Shield Ass'n/Blue Cross & Blue Shield*, 788 F.2d 888, 891 (2d Cir. 1986)(stating that PRM rules "have consistently been held to be 'interpretive rules,' and thus exempt from the notice and comment requirements"); *Columbus Community Hosp., Inc. v. Califano*, 614 F.2d 181, 187 (8th Cir. 1980) (stating that PRMs are agency interpretive rules) .

Even beyond the simple fact that PRMs are generally categorized as interpretive, the work done by PRM § 2534.5 places it within the *Guernsey* Court's definition of an interpretive rule.  The rule does not effect new substantive reimbursement standards inconsistent with prior regulations—the central characteristic of a substantive rule. *See Guernsey*, 514 U.S. at 99; *Warder v. Shalala*, 149 F.3d 73, 80 (1st Cir. 1998).  Rather, as explained above, the PRM reasonably interprets a statute and regulation which placed the determination of general terms such as the "reasonableness" of costs and the "typicality" of services in the hands of the Secretary.  We agree with the Secretary that the PRM partially performs this role by providing the means by which HB-SNFs' systemic unreasonable costs are accounted for in determining exceptions.  Thus, just as in *Friedrich*, the PRM "creates no new law."  894 F.2d at 837.  "Rather, it interprets the statutory language . . . as applied to a particular medical service or method of treatment."  *Id.*; *see also Warder*, 149 F.3d at 80 (finding an administrative ruling to be interpretive because "it addresse[d] an area of ambiguity" and did not "stake out any ground the basic tenor of which [was] not already outlined in the law itself") (internal quotations and citation omitted).  St. Francis's arguments to the contrary are

## II.

This Court reviews an order granting summary judgment *de novo* and uses the same legal standard as used by the district court.  *See Terry Barr Sales Agency, Inc. v. All-Lock Co.,* 96 F.3d 174, 178 (6th Cir. 1996).  Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions of file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *accord Terry Barr*, 96 F.3d at 178.  Moreover, "the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion."  *Matsushita Elec. Indus Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)(citation omitted).  However, "[f]actual disputes that are irrelevant or unnecessary will not be counted."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

In reviewing the Secretary's interpretation of regulations, courts may overturn the Secretary's decision only if it is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law."  *Thomas Jefferson Univ.   v.  Shalala*, 512 U.S. 504, 512 (1994) (citation omitted); *see also Harris County Hosp. Dist. v. Shalala*, 64 F.3d 220, 221 (5th Cir. 1995).  Further, courts are to "give substantial deference to an agency's interpretation of its own regulations."  *Thomas Jefferson Univ.*, 512 U.S. at 512; *see Martin v. Occupational Safety and Health Review Comm'n*, 499 U.S. 144, 151 (1991) ("Because applying an agency's regulation to complex or changing circumstances calls upon the agency's unique expertise and policymaking prerogatives, we presume that the power authoritatively to interpret its own regulations is a component of the agency's delegated lawmaking powers."); *Harris*, 64 F.3d at 221 ("The Secretary's interpretation of Medicare regulations is given controlling weight unless it is plainly  erroneous  or  inconsistent  with  the regulation.")(internal quotations omitted).  In sum, if "it is a reasonable regulatory interpretation . . . we must defer to it."

*Shalala v. Guernsey Memorial Hosp.*, 514 U.S. 87, 94-95 (1995).

### III.

Because we agree that the Secretary's interpretation is not arbitrary or capricious, we affirm the district court's holding.

### A.

St. Francis offers several reasons that the Secretary's legal interpretation of C.F.R. § 413.30(f)--embodied in PRM § 2534.5--falls short of the requirement that agency interpretations not be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Most importantly, St. Francis asserts that PRM § 2534.5 contradicts plain statutory and regulatory language. It contends that both 42 U.S.C. § 1395yy(a) and 42 C.F.R. § 413.30 "dictate" that a provider who demonstrates that its costs in excess of its cost limit are 1) due to the provision of atypical services and 2) reasonable, attributable, identified and verified, is entitled to reimbursement in full above the cost limit. St. Francis's Br. at 24. Therefore, St. Francis argues, PRM § 2534.5 contradicts the plain language of the statute and regulation by imposing a blanket (and "arbitrary") limit requiring that costs be excepted only to the extent that total costs exceed that limit.

St. Francis offers several other arguments to bolster its case. First, St. Francis asserts that PRM § 2354.5 does not square with the legislative intent behind the Medicare Act provisions. It points to a Senate Finance Committee report which it claims makes clear that facilities like St. Francis should be able to recover *all* of their reasonable costs, regardless of whether they are a FS-SNF or a HB-SNF. *See* St. Francis's Br. at 29. Second, St. Francis argues that PRM § 2534.5 is unreasonable on policy grounds because it treats FS-SNFs and HB-SNFs disparately. The regime places FS-SNFs that provide atypical services at a distinct advantage, reimbursing them for all their costs. On the other hand, HB-SNFs receive less than full reimbursement for providing the

unreasonable costs as determined by Congress, HB-SNFs and FS-SNFs are treated relatively the same.

Third, St. Francis misunderstands how PRM § 2534.5 operates when it attacks it for being irrational on policy grounds. Specifically, St. Francis believes that the regime is irrational because it deems costs below the 112% level to be unreasonable, but reasonable when they exceed that amount. *See* St. Francis's Br. at 34. But this is not an accurate characterization of the PRM's effect. As the district court stated, the "discount" applies to the costs of *all* HB-SNFs above the RCL; all have costs which are deemed to be unreasonable, and all are "systematically undercompensate[d] in exactly the same manner." *St. Francis*, 10 F.Supp.2d at 894. The only difference rendered is that once excess costs span beyond the 112% threshold, a portion of the excess costs resulting from atypical services can be reimbursed. Yet the discount factor reflecting the "unreasonable" costs of HB-SNFs still impacts upon all HB-SNFs above the 112% level; in other words, there is still an amount of their costs which, deemed unreasonable by the PRM, those HB-SNFs cannot recover. *See supra* n. 9.

### 3. St. Francis's APA Argument

Finally, we can not agree with St. Francis's argument that PRM § 2534.5 is invalid because it was not adopted pursuant to the notice and comment procedures set forth in the APA, 5 U.S.C. § 553(b). In *Guernsey*, the Court sustained another of the Secretary's PRMs concerning reimbursement. In doing so, the Court stated that the PRM at issue was not subject to the notice and comment requirement of the APA because it was a "prototypical example of an interpretive rule." 514 U.S. at 99. *See* 5 U.S.C. § 553(b)(A) (establishing that notice and comment are not required for "interpretive rules, general statements of policy, or rules of agency organization, procedure or practice"). Specifically, the Court defined interpretive rules as those "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." *Guernsey*, 514 U.S. at 99. (citation

established by Congress in 42 U.S.C. § 1395yy and elaborated upon by 42 C.F.R. § 413.30.[10]

### 2. Policy Arguments

We also agree with the district court that St. Francis's policy arguments against PRM § 2534.5 are unavailing. First, given the clear Congressional conclusion that HB-SNFs suffer from general cost inefficiencies, the Secretary, through the intermediary, should not be required to review each provider's submitted reimbursement request to determine if its costs were reasonable. Particularly in light of SNFs' vastly different services and patient populations, such a requirement would impose a high burden and cost on the Secretary — a burden not required by the statute or the regulation. It was neither arbitrary nor capricious for the Secretary instead to introduce a discount factor to account for the systemic cost inefficiencies identified by Congress, while still allowing HB-SNFs to obtain reimbursement when they demonstrate that costs above the 112% threshold are due to atypical services.

Second, St. Francis errs when it argues that PRM § 2534.5 unfairly disadvantages HB-SNFs relative to FS-SNFs for "no legitimate reason." St. Francis's Br. at 32. This assertion simply ignores Congress's conclusion that FS-SNFs are more efficient than HB-SNFs, and thus should be reimbursed more favorably. Stated differently, once discounted for their

---

[10]We agree with the Secretary's arguments regarding legislative history. First, the history is sparse and generally inconclusive, and should be given little weight when the text of the statute so clearly resolves this dispute. Second, even the history to which St. Francis points does not contradict the Secretary's reading of the statutory language. The language from the Senate report that St. Francis emphasizes is that "[f]acilities eligible for exceptions could receive, where justified, *up to all of their reasonable costs*." Senate Comm. on Finance, 98th Cong., 2d Sess., Deficit Reduction Act of 1984: Explanation of Provisions Approved by the Committee on March 21, 1984, Vol. 1 at 947 (Comm. Print 1984) (emphasis added). PRM § 2534.5, through the discretion granted to the Secretary by the plain text of the Medicare Act, is indeed consistent with this directive because it provides a general formula for determining the extent to which an HB-SNF's costs are "reasonable."

same services at the same cost; the regime thus penalizes them and provides a disincentive to provide such services. St. Francis argues that this result "turns the tables" on the true policy intent; indeed, it maintains that Congress originally intended that HB-SNFs should "receive more than freestanding facilities because it recognized that [HB-SNFs] incur more costs in providing the same services" than the FS-SNFs. St. Francis's Br. at 32. Third, St. Francis argues that because HCFA previously interpreted the applicable regulations differently, the new interpretation is not entitled to deference. Finally, St. Francis asserts that PRM § 2534.5 is procedurally invalid because it is a substantive rule, yet it was not passed pursuant to the notice and comment requirements of the Administrative Procedure Act, 5 U.S.C. § 553 ("APA").

### B.

We agree with the district court that St. Francis has not shown that PRM § 2534.5 is an arbitrary or capricious interpretation of either 42 U.S.C. § 1395yy or 42 C.F.R. § 413.30.

### 1. Statutory and Regulatory Text

St. Francis's first argument is that PRM § 2534.5 "is inconsistent with the plain language of the governing statute and regulation." St. Francis's Br. at 23. We disagree with this contention because the statute explicitly granted the Secretary broad discretion and because she exercised this discretion consistent with the clear policy choices Congress made in the statute.

Neither Congress in 42 U.S.C. § 1395yy nor the Secretary in 42 C.F.R. § 413.30 mandated that a HB-SNF be reimbursed any amount above the statutory RCL set forth in § 1395yy. St. Francis therefore overstates its case when it claims the language of these provisions "*dictates* that a provider who demonstrates that its costs in excess of its cost limit are 1) due to the provision of atypical services and 2) reasonable, attributable, identified and verified, *is entitled* to

reimbursement in full above the cost limit." St. Francis's Br. at 24 (emphasis added). Instead, both provisions are phrased in the permissive, merely stating that the Secretary "may" adjust cost limits upward. 42 U.S.C. § 1395yy(c); 42 C.F.R. § 413.30(f). Moreover, neither provision provides guidance as to the level of adjustment the Secretary must make. Specifically, 42 C.F.R. § 413.30 provides that although limits "may" be adjusted when "atypical," they should only be adjusted upward "to the extent the costs are reasonable." 42 C.F.R. § 413.30(f). As the Secretary argued, this explicitly placed the determination of "typicality" of services versus "reasonableness" of costs within her discretion.[8]

Having noted what the statute does not do, it is important to note what it *does* do. As discussed *supra*, Congress responded to studies demonstrating that about half of the greater cost of HB-SNFs was due to inefficiency by establishing a two-tier system which prevents HB-SNFs from being reimbursed for those inefficient costs. Hence, for HB-SNFs, Congress set the new statutory cost limit at fifty percent of the difference between 112% of the mean per diem costs for HB-SNFs and FS-SNFs. Of course, just as Congress did not address how the Secretary should generally grant upward adjustments in reimbursements, it also did not specify how the Secretary should do so in light of this new regime accounting for HB-SNFs' inefficiency. Yet again, she was granted discretion to make this determination.

Given these aspects of the statute, we agree with the district court that the Secretary's interpretation of the regulation and statute in the PRM is reasonable, not arbitrary. First, we agree with the Secretary that the best way to characterize the effect of the PRM is that it applies a "discount factor" to all HB-SNFs to account for the "unreasonable costs" above those of FS-SNFs. As the district court recognized, discounting for

---

[8] This is consistent with other parts of the Medicare Act, which also "authorize[] the Secretary to promulgate regulations 'establishing the method or methods to be used' for determining reasonable costs." *Guernsey*, 514 U.S. at 91 (quoting 42 U.S.C. § 1395x(v)(1)(A)).

these unreasonable costs comports with the general recognition by Congress that "certain systemic inefficiencies . . . associated with unreasonable costs [] are associated with HB-SNFs." *St. Francis*, 10 F.Supp.2d at 892. In fact, the PRM calculation reduces the reimbursement to HB-SNFs by the very same proportion that Congress deemed to be inefficient — half of the difference in costs between FS-SNFs and HB-SNFs.[9] Likewise, the guideline comports with 42 C.F.R. § 413.30, which allows the Secretary to determine the extent to which costs for atypical services are "reasonable." 42 C.F.R. § 413.30(f).

In sum, PRM § 2534.5 does not *create* the "two-tier" system in contravention of the statute and regulation. To the contrary, the Secretary merely acted within the discretion she was granted by putting into place the very cost ratio

---

[9] Once again, if we take $80 as 112% of the FS-SNF mean, and $120 as 112% of the HB-SNF mean, the results of the application of PRM § 2534.5 are as follows:

| | Actual Costs | Amount Reimbursed |
|---|---|---|
| | $150 | $130 |
| | $140 | $120 |
| | $130 | $110 |
| 112% of HB-SNF mean ($120) | $120 | $100 |
| | $110 <---(the "gap")--> | $100 |
| HB-SNF statutory RCL ($100) | $100 | $100 |
| | $90 | $90 |
| 112% of FS-SNF mean ($80) (*i.e.*, FS-SNF statutory RCL) | $80 | $80 |

Once at or above the 112% level, the difference between an HB-SNF's actual costs and the amount it is reimbursed is $20, which is half of the difference between 112% of the HB-SNF mean and 112% of the FS-SNF mean (which is $40). Thus, in determining upward adjustments as Congress bid her to, the Secretary is using the very ratio—and the very assumptions regarding the inefficiencies of HB-SNFs—that the statute prescribed for establishing the RCL for HB-SNFs.