Motion for Rehearing Overruled; Affirmed; Opinion of December 24, 2004,
Withdrawn; Opinion on Rehearing filed April 14, 2005









 

Motion for Rehearing Overruled; Affirmed; Opinion of
December 24, 2004, Withdrawn; Opinion on Rehearing filed April 14, 2005.

 

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-03-01281-CV

____________

 

CHRISTUS HEALTH
GULF COAST, CHRISTUS HEALTH SOUTHEAST TEXAS, GULF COAST DIVISION, INC.,
MEMORIAL HERMANN HOSPITAL SYSTEM, AND BAPTIST HOSPITALS OF SOUTHEAST TEXAS, Appellants

 

V.

 

AETNA, INC. AND
AETNA HEALTH, INC., Appellees

 



 

On Appeal from the 157th
District Court

Harris County, Texas

Trial Court Cause No. 02-39946

 



 

O P I N I O N   O N  
R E H E A R I N G








Appellants, Christus Health Gulf Coast,
Christus Health Southeast Texas, Gulf Coast Division, Inc., Memorial Hermann
Hospital System, and Baptist Hospitals of Southeast Texas (collectively “the
Hospitals”), sued appellees, Aetna, Inc. and Aetna Health, Inc. (collectively
“Aetna”), for breach of contract, quantum meruit, breach of fiduciary duty, and
to collect on accounts arising from Aetna’s failure to pay the Hospitals for
health care services they provided to Medicare patients enrolled in an Aetna
health maintenance organization (“HMO”). 
Aetna moved to dismiss for lack of subject matter jurisdiction, arguing
that the Hospitals failed to exhaust federal administrative remedies provided
under the Medicare program.  The trial
court agreed and dismissed for lack of jurisdiction.  In three issues, the Hospitals claim the
trial court erred in granting Aetna’s motion to dismiss.  Because we find that the Hospitals were
required to first exhaust administrative remedies, we affirm.

In our opinion of December 28, 2004, we
affirmed the trial court’s judgment. On January 7, 2005, the Hospitals filed a
motion for rehearing. We overrule the Hospitals’ motion, withdraw our previous
opinion, and issue this opinion on rehearing, affirming the trial court’s
judgment.

                                       I.  The
Medicare Program

Title XVIII of the Social Security Act, 42
U.S.C. §§ 1395–1395ggg (2000), commonly known as the Medicare program, is
administered by the Department of Health and Human Services (“HHS”).  The Medicare program traditionally consisted
of two parts.  Part A provides insurance
against the cost of institutional health services, such as hospitals and
nursing homes.  Part B provides, for a
monthly premium, supplemental benefits for additional medical needs, such as
physician services and laboratory tests. 
See Schweiker v. McClure, 456 U.S. 188, 189–90 (1982) (describing
Medicare Parts A and B).  








In 1997, Congress amended the statute and
added a new Part C called the Medicare+Choice or “M+C” program.  Medicare Program; Medicare+Choice Program,
Final Rule with Comment Period, 65 Fed. Reg. 40170, 40171 (June 29, 2000).  Congress created the M+C program to “allow
beneficiaries to have access to a wide array of private health plan choices” in
addition to traditional Medicare and to “enable the Medicare program to utilize
innovations that have helped the private market contain costs and expand health
care delivery options.”  H.R. Conf. Rep. No. 105-217, at 585
(1997), reprinted in 1997 U.S.C.C.A.N. 205–06.  To accomplish these goals, the Health Care
Financing Administration (“HCFA”), now called the Centers for Medicare and
Medicaid Services, contracts with HMOs and other private firms to provide
health care to Medicare patients who choose coverage under Part C as opposed to
the traditional route of Parts A and B. 
Medicare+Choice Program, 65 Fed. Reg. at 40172.  The entity that contracts with the HCFA is called
an M+C organization.  M+C organizations
may then contract with providers to provide health care services to their
Medicare enrollees under the terms and conditions negotiated in the
contract.  Such providers are contract
providers.  Medicare patients may also
seek health care services from providers with no contractual relationship with
an M+C organization.  These are
noncontract providers.

II. 
Factual Background

NYLCare 65 is an HMO owned by Aetna, and
NYLCare 65 became an M+C organization by virtue of a contract with the HCFA.[1]  Aetna then contracted with North America
Medical Management (“NAMM”) to administer this health care program.  Aetna paid NAMM a monthly capitation payment,[2]
and NAMM agreed to be responsible for paying claims from health care providers
for services to M+C patients.  NAMM then
contracted with various health care providers to offer these services.  Each of the Hospitals had such a contract
with NAMM.

NAMM became insolvent and never responded
to approximately 6,000 claims from the Hospitals totaling over $13
million.  The Hospitals then demanded
that Aetna pay the claims on the theory that Aetna was statutorily liable to
pay for the health care services provided to its patients, despite having
contracted with NAMM to perform that service. 
Aetna refused to pay.








The Hospitals sued Aetna for breach of
contract, quantum meruit, breach of fiduciary duty, and to collect on
accounts.  The trial court granted
Aetna’s motion to dismiss for lack of subject matter jurisdiction because the
Hospitals did not first pursue their claims through the administrative process
established under the Medicare program. 
The Hospitals claim this was error because, for a variety of reasons,
this administrative process does not apply to them.

III. 
Analysis

A. 
The Hospitals’ claims arise under the Medicare Act.

Courts have subject matter jurisdiction to
review claims “arising under” the Medicare Act only after the claimant
unsuccessfully seeks payment and then exhausts the administrative remedies
provided under the Act.  See Heckler
v. Ringer, 466 U.S. 602, 614–15 (1984). 
A claim arises under the Medicare Act if “both the standing and the
substantive basis for the presentation” of the legal claim is the Act or
if it is “inextricably intertwined” with a claim for benefits.  See id. at 614–15, 624.  In applying this standard, it does not matter
how a claim is characterized.  If, “at
bottom,” the plaintiff seeks Medicare benefits, the claim arises under the Act
and must go through the administrative process. 
Id. at 614.








The Supreme Court has instructed that the
term “arising under” be construed “quite broadly.”  Id. at 615.  This promotes the important policy
considerations of avoiding premature interference with agency processes and
uniformity and consistency in administration of the Medicare program.  See Weinberger v. Salfi, 422 U.S. 749,
765 (1975) (“Exhaustion is generally required as a matter of preventing
premature interference with agency processes, so that the agency may function
efficiently and so that it may have an opportunity to correct its own errors,
to afford the parties and the courts the benefit of its experience and
expertise, and to compile a record which is adequate for judicial review.”); Maximum
Home Health Care, Inc. v. Shalala, 272 F.3d 318, 321 (6th Cir. 2001) (“The
purpose of a regulatory scheme such as Medicare is to provide uniform rules by
which all participants may be treated equally.”); Friedrich v. Sec’y of
Health & Human Servs., 894 F.2d 829, 837 (6th Cir. 1990) (“National
standards are essential if there is to be uniformity and equality in the
administration of Medicare.”).  

Such uniformity is crucial on decisions
regarding Medicare coverage so that a Medicare patient’s right to health care
services does not vary from state to state. 
Thus, all coverage decisions must go through the administrative
procedures of the Medicare program.  See
42 C.F.R. § 422.402(b)(3) (2003) (stating that the Medicare Act preempts all
state law coverage determinations); Medicare+Choice Program, 65 Fed. Reg. at
40261 (explaining that state courts are preempted from deciding any claim “in
which the legal issue before the court is . . . whether services are covered
under the terms of an M+C contract”); Medicare Program; Establishment of the
Medicare+Choice Program, Interim Final Rule with Comment Period, 63 Fed. Reg.
34968, 35013 (June 26, 1998) (noting that the Medicare appeals process is the
exclusive remedy for any dispute over whether a service is covered under a
Medicare contract).[3]  For these important policy reasons, we
resolve any doubts in favor of requiring claims to first proceed through the
administrative process.  See New York
v. Lutheran Ctr. for the Aging, Inc., 957 F. Supp. 393, 397 (E.D.N.Y. 1997)
(holding that “regardless of whether the services at issue are ultimately
determined to be covered by Medicare, they still must be litigated through the
administrative process”).








We hold that the Hospitals’ claims arise
under the Medicare Act.  Though their
claims are characterized under state law, such as for breach of contract, they
are “inextricably intertwined” with a claim for benefits because, “at bottom,”
they are seeking payment for services provided to Medicare patients.  Heckler, 466 U.S. at 614.  As such, the Hospitals were required to first
exhaust the administrative process.  See
id.  Though Heckler was decided
under Parts A and B of Medicare, at least three other courts have applied this
same analysis to claims under Part C, including one involving NAMM, the very
same intermediary in this case.  See
In re Heritage Southwest Med. Group, P.A., 309 B.R. 916 (Bankr. N.D. Tex.
2004); Foley v. Southwest Tex. HMO, Inc., 226 F. Supp. 2d 886 (E.D. Tex.
2002); Lifecare Hosps., Inc. v. Ochsner Health Plan, Inc., 139 F. Supp.
2d 768 (W.D. La. 2001).  We agree with
their analysis of this issue and conclude that the trial court did not have
subject matter jurisdiction over the Hospitals’ claims.

B. 
The Hospitals are not excused from exhausting administrative remedies.

The Hospitals argue that, for a variety of
reasons, the administrative process does not apply to them and their
claims.  A detailed description of the
administrative process is necessary to put the Hospitals’ arguments in
context.  

1. 
The administrative process

The Medicare program contains two separate
administrative procedures that are relevant in this case:  one for pure payment disputes and one for
appealing “organization determinations” from the M+C organization.








When processing payment claims from
noncontract providers—that is, providers with no contractual relationship with
an M+C organization—an M+C organization must provide “prompt payment.”  42 U.S.C. § 1395w-27(f)(1); 42 C.F.R. §
422.520(a) (2003).  The standard for
assessing whether payment is prompt is set forth in federal regulations.  See 42 C.F.R. § 422.520(a).  When a payment dispute occurs, the provider
can seek relief from the HCFA.  If, after
notice and an opportunity for a hearing, the HCFA determines an M+C
organization has failed to make prompt payment, it can provide direct payment
of the claim and then reduce the payments the HCFA makes to the M+C
organization pursuant to their contract. 
42 U.S.C. § 1395w-27(f)(2); 42 C.F.R. § 422.520(c) (2003).  This administrative procedure is not
available for pure payment disputes between an M+C organization and a contract
provider because although the contract between the M+C organization and the
provider must contain a prompt payment provision, the content of that provision
is determined by the contract and is therefore a matter of state law.  See 42 C.F.R. § 422.520(b) (2003).

Procedures for M+C organizations to
determine whether a Medicare patient is entitled to receive a service and the
amount, if any, the patient is required to pay are called “organization determinations.”  42 U.S.C. § 1395w-22(g)(1)(A); 42 C.F.R. §
422.566(a), (b) (2003).[4]  Disputes over organization determinations are
governed by a different and more elaborate administrative procedure.  Patients can request a reconsideration of an
adverse organization determination and can then appeal through several steps,
concluding with judicial review in federal court in some cases.  42 U.S.C. § 1395w-22(g)(2)–(5); 42 C.F.R. §§
422.578–.626 (2003).  Though this process
is obviously designed to protect patients’ rights regarding decisions such as
coverage, providers can have an interest as well.  As such, providers can request an
organization determination and, in some circumstances, are parties to the
organization determination with full rights of appeal.  See 42 C.F.R. §§ 422.574(b), (d),
422.578–.626 (2003).[5]








2. 
The Hospitals must exhaust administrative remedies.

The Hospitals argue that they are not
required to resort to the administrative process because (1) the administrative
process applies only to patients and not providers, (2) this is not a coverage
dispute, and (3) no organization determination was made to invoke the
administrative process.  We disagree with
each of these arguments.








The Hospitals’ claim that the
administrative process does not apply to providers is belied by the plain
language of the statute and regulations. 
As discussed above, noncontract providers can complain to the HCFA about
pure payment disputes.  In the
organization determination appeals process, providers may request an
organization determination, and providers who are assignees of the patient or
otherwise have an appealable interest are parties and may appeal an adverse
organization determination.  See
42 C.F.R. §§ 422.566(c), 422.574(b), (d) (2003); see also Establishment
of the Medicare+Choice Program, 63 Fed. Reg. at 35026 (stating the provision
allowing any other provider with an appealable interest to be a party is
intended to be broad).[6]  Though the interests of patients is the
primary focus of this administrative process, providers have subsidiary
interests (such as in being able to provide services and in being paid for
them) that are clearly contemplated and specifically provided for in this
process.  Thus, a contract provider in a
payment dispute with an M+C organization has an administrative remedy if that
dispute is in conjunction with a patient-focused dispute such as coverage.  Three other courts considering
Medicare+Choice provider payment disputes have also required the providers to
exhaust administrative remedies.  See
Heritage, 309 B.R. at 919–20; Foley, 226 F. Supp. 2d at 903–07; Lifecare,
139 F. Supp. 2d at 770–72.








The Hospitals also contend that this is
not a coverage dispute but is merely a prompt payment dispute and therefore, as
contract providers, they have no administrative remedies to exhaust.  The Medicare Act mandates that providers
supplying services pursuant to a contract with an M+C organization cover at
least all services covered under Medicare Parts A and B.  42 C.F.R. § 422.100(a), (c) (2003).  The Texas statute that provides the substance
of Aetna’s prompt payment obligation in this case states that an HMO that
violates its prompt payment obligations is liable “for the full amount of
billed charges . . . , less . . . any charge for a service that is not
covered by the health care plan.”[7]  Thus, even if Aetna violated its prompt
payment obligation, according to the plain wording of the statute, it may still
assert a defense to payment if the services are not covered.[8]  If coverage issues are even possible, for the
important policy reasons promoted by the administrative process and ensuring
uniformity of Medicare coverage, the dispute must go through the administrative
process.  See Weinberger, 422 U.S.
at 765; Maximum Home Health Care, 272 F.3d at 321; Friedrich, 894
F.2d at 837; Lutheran Ctr. for the Aging, 957 F. Supp. at 397.

In a related argument, the Hospitals
assert that since the administrative process is designed for coverage-type
issues, other matters, such as contract interpretation, are beyond the HCFA’s
expertise, and therefore exhaustion would be futile.  Even if some of their claims are not within
the typical scope of the HCFA’s review, the agency must first be allowed to
consider those issues on which it has expertise before judicial review;
otherwise, the exhaustion process would be undermined.  See Kaiser v. Blue Cross of Cal., 347
F.3d 1107, 1115 & n.4 (9th Cir. 2003); see also Lifecare, 139
F. Supp. 2d at 773 (“While it is clear that Lifecare would prefer an immediate
appeal to the district court rather than the often lengthy administrative
review process, in light of the fact that Lifecare may, in fact, seek judicial
review after pursuing its administrative remedies, the court holds that it
would not be an exercise in futility for Lifecare to comply with the Medicare
Act’s exhaustion requirements.”).

Finally, the Hospitals claim that no
organization determination occurred, which is a necessary precursor of invoking
the procedure for challenging an adverse organization determination.  They contend that NAMM never processed the
claims and that nonpayment by default is not an organization
determination.  Even if NAMM did not make
an organization determination by failing to pay the Hospitals’ claims,[9]
Aetna clearly made one when it refused the Hospitals’ subsequent demand of
payment for services provided to Medicare patients.  See Heritage, 309 B.R. at 920; Lifecare,
139 F. Supp. 2d at 772–73; 42 C.F.R. § 422.566(b)(2), (3).








The Hospitals point to two authorities
they claim support their argument that its dispute with Aetna is not subject to
the administrative process.  First, four
of the five Hospitals submitted a letter to the HCFA requesting that the agency
intervene and hold Aetna liable on the claims NAMM failed to pay.  The agency’s response stated that “[t]his
type of contract dispute between parties is an issue for the state judiciary to
decide” because the regulations “do not . . . contemplate Federal intervention
in provider payment disputes involving contracted M+C providers that
voluntarily enter into contracts with M+C organizations.”  That response is accurate if the parties’
dispute is solely a prompt payment issue. 
See 42 U.S.C. § 1395w-27(f); 42 C.F.R. § 422.520.  However, the HCFA, who did not have the
benefit of Aetna’s perspective on the dispute, apparently did not consider the
potential coverage issues, which we have concluded must be resolved through the
portion of the administrative process governing organization determinations.  Further, the Hospitals did not request the
HCFA’s opinion regarding exhaustion of administrative remedies, and the HCFA
never mentioned the issue in its responding letter.  In any event, we are not bound by an
informal, ex parte letter from an agency. 
See Lifecare, 139 F. Supp. 2d at 772–73.  

Second, the Hospitals rely on a sentence
from an HCFA manual that says “contracted providers do not have appeal
rights.”  Medicare Managed Care Manual,
ch. 13, § 70.1, available at http://www.cms.hhs.gov/manuals/.  This blanket statement that contract providers
have no right of appeal is in direct conflict with the regulations.  Though the administrative procedure for pure
payment disputes is not available to contract providers, the regulation
defining parties to an organization determination, who by definition have
appeal rights, contains no such limitation on a provider’s rights, and the
manual makes no attempt to explain its position.  Compare 42 C.F.R. § 422.520, with
42 C.F.R. § 422.574.  If an agency manual
conflicts with regulations, the regulations control.  See Cent. Laborers’ Pension Fund v. Heinz,
124 S. Ct. 2230, 2238 (2004) (“[N]either an unreasoned statement in the manual
nor allegedly longstanding agency practice can trump a formal regulation with
the procedural history necessary to take on the force of law.”).








The Hospitals’ claims “arise under” the
Medicare Act, which means the Hospitals must exhaust administrative remedies
before litigating their claims in court. 
The Hospitals were not excused from exhausting the administrative
process, and their failure to do so deprived the trial court of subject matter
jurisdiction.  Therefore, we affirm the
judgment of the trial court dismissing this action for lack of jurisdiction.[10]

 

 

/s/      Leslie Brock Yates

Justice

 

Judgment
rendered and Opinion on Rehearing filed April 14, 2005.

Panel
consists of Justices Yates, Anderson, and Hudson.











[1]  None of the
contracts involved in this case are part of the record on appeal, and the
parties are not clear whether Aetna itself or NYLCare 65 contracted with the
HCFA.  As it does not affect our
analysis, for ease of reference, we will assume Aetna is the contracting
party.  We will refer to Aetna as the M+C
organization and will not refer to NYLCare 65 as a separate entity but included
in the term “Aetna.”





[2]  A capitation
payment is “a fixed per enrollee per month amount paid for contracted services
without regard to the type, cost, or frequency of services furnished.”  42 C.F.R. § 422.350(b) (2003).





[3]  The Hospitals
claim that Aetna must also prove that federal law preempts their claims before
they can be required to exhaust administrative remedies.  The Hospitals cite no authority for this
proposition.  Preemption and subject
matter jurisdiction are distinct inquiries. 
See Baker v. IBP, Inc., 357 F.3d 685, 688 (7th Cir. 2004)
(“[P]reemption is a defense and thus does not affect subject-matter
jurisdiction.”).  Because we have
determined that the Hospitals’ failure to exhaust administrative remedies
deprived the trial court  of subject
matter jurisdiction, we need not also decide whether their claims are
preempted.  Nevertheless, regulations and
commentary regarding preemption are useful in demonstrating the intent that all
coverage issues must go through the administrative process.





[4]  The regulations define an
organization determination in pertinent part as follows:

 

An organization determination is
any determination made by an M+C organization with respect to any of the
following:

. . . . 

(2) Payment for any other health
services furnished by a provider other than the M+C organization that the
enrollee believes— 

(i) Are covered under Medicare; or

(ii) If not covered under Medicare,
should have been furnished, arranged for, or reimbursed by the M+C
organization. 

(3) The M+C organization’s refusal
to provide or pay for services, in whole or in part, including the type or
level of services, that the enrollee believes should be furnished or arranged
for by the M+C organization. 

. . . .

 

42 C.F.R. § 422.566(b).  





[5]  Section
422.574, which defines parties to the organization determination, states as
follows:

 

The parties to the organization determination are— 

(a) The enrollee (including his or her authorized
representative); 

(b) An assignee of the enrollee (that is, a physician
or other provider who has furnished a service to the enrollee and formally
agrees to waive any right to payment from the enrollee for that service); 

(c) The legal representative of a deceased enrollee’s
estate; or

(d) Any other provider or entity (other than the M+C
organization) determined to have an appealable interest in the proceeding.

 

42 C.F.R. § 422.574 (2003).





[6]  The Hospitals
claim that although they may be assignees of their patients, they are not
pursuing any rights they might have as assignees but rather their own separate
contractual right to payment, and therefore are not proper parties to any
organization determination under 42 C.F.R. § 422.574(b).  Aetna 
responds that the Hospitals are most certainly assignees since they are
not seeking payment from their patients and that they cannot choose to
disregard this status to avoid the administrative process.  We need not resolve this issue because we
conclude that the Hospitals have an appealable interest in the proceeding and
therefore are parties under 42 C.F.R. § 422.574(d).





[7]  At the time
this lawsuit arose, this prompt payment language was found at Tex. Rev. Civ. Stat. Ann. art.
20A.18B.  The statutory prompt payment
scheme has since been repealed and recodified at Tex. Ins. Code Ann. §§ 843.336–.353 (Vernon 2004–2005).  See Act of May 1, 2001, 77th Leg.,
R.S., ch. 1419, 2001 Tex. Gen. Laws 3568.





[8]  At oral
argument, the Hospitals asserted that if Aetna has not promptly paid, it no
longer may raise a coverage defense. 
However, it provided no authority for that statement, and we have been
unable to find any.  Rather, based on the
clear wording of the applicable statute, Aetna is not liable for “any charge
for a service that is not covered by the health care plan.”  Tex.
Rev. Civ. Stat. Ann. art. 20A.18B(f) (repealed).  This makes sense because presumably the
contract obligates the provider only to provide services covered by the
contract.





[9]   But see
42 C.F.R. § 422.568(f) (2003) (“If the M+C organization fails to provide the
enrollee with timely notice of an organization determination as specified in
this section, this failure itself constitutes an adverse organization
determination and may be appealed.”).





[10]   Two days
after we issued our original opinion, the Fifth Circuit issued its opinion in RenCare,
Ltd. v. Humana Health Plan of Texas, Inc., 395 F.3d 555 (5th Cir.
2004).  The court considered a payment
dispute between an M+C organization, Humana, and a contract provider, RenCare,
over reimbursement for end stage renal dialysis services RenCare provided to
Humana patients.  Id. at
556–57.  The court determined that the
administrative process did not apply to such claims because these claims were
not “inextricably intertwined” with a claim for Medicare benefits and therefore
did not “arise under” the Medicare Act.  Id.
at 557–59.

The Hospitals moved for rehearing, arguing that our
opinion is inconsistent with RenCare and therefore should be
withdrawn.  We disagree.  In RenCare, the dispute appears to
have been a pure payment dispute with no mention of any potential coverage
issues.  Id. at 557.  By contrast, Aetna has a potential coverage
defense to these 6,000 claims.  The
potential of a coverage dispute is critical to our analysis that the claims
arise under the Medicare Act and therefore must first proceed through the
administrative process.  The RenCare
opinion does not consider coverage issues and is therefore distinguishable.

Further, the crux of the court’s analysis is a
provision in RenCare’s contract with Humana that waived RenCare’s right to
payment from its enrollees, which meant that Humana’s patients had no financial
interest in the dispute.  Id. at
558.  We cannot determine if we would
reach the same conclusion as the Fifth Circuit because the parties have not
provided us with the contracts between Aetna and the Hospitals.  The Hospitals argue that such a waiver must be
included in their contracts, citing 42 C.F.R. § 422.502(g)(1)(i).  That provision states that an M+C
organization must make arrangements to protect enrollees “from incurring
liability . . . for payment of any fees that are the legal obligation of the M+C
organization.”  As discussed above, given
that Aetna need not pay any fee for a service that is not covered by the
contracts, this regulation does not address who would be liable if Aetna
successfully asserted a coverage defense.

In our original opinion, we cited Sono Tech Enters., Inc. v. New
Orleans Reg’l Physician Hosp., No. Civ.A. 04-2024, 2004 WL 2115609, at *3–4 (E.D. La.
Sept. 13, 2004), which held that a provider’s claim against M+C organization
was properly removed to federal court because it arises under the Medicare Act,
as additional support for our analysis. 
In an unpublished order, the court recently reconsidered and reversed
its prior ruling in light of RenCare, noting simply that RenCare
“forecloses any argument by Defendants that Plaintiff’s claims arise under the
Medicare Act.”  Neither the order nor the
original opinion provide much detail about the facts of the case, but it does
appear that coverage was an issue in Sono Tech.  See id. at *4 (“Sono Tech is a medical
care provider seeking payment for services that Defendants contend is not
covered by Medicare.”).  Thus, to the extent Sono Tech can be
read to conclude that RenCare controls when coverage is at issue, we
reject its analysis.